Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
595 Market Street, Suite 2750
San Francisco, CA 94105
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: cand.uscourts@classcounsel.com

*Liaison Counsel*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS J. PRIMO and EVAN POWELL, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>vs.<br><br>PACIFIC BIOSCIENCES OF CALIFORNIA, INC., HUGH C. MARTIN, SUSAN K. BARNES, BRIAN B. DOW, WILLIAM ERICSON, BROOK BYERS, MICHAEL HUNKAPILLER, RANDALL LIVINGSTON, SUSAN SIEGEL, DAVID SINGER, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. INC., DEUTSCHE BANK SECURITIES INC. and PIPER JAFFRAY & CO.,<br><br>               Defendants. | Case No. 4:11-CV-6599 (CW)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Thomas J. Primo ("Primo") and Evan Powell ("Powell") (collectively, "Plaintiffs") allege the following based upon the investigation of their counsel, which includes, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Defendant Pacific Biosciences of California, Inc., ("PacBio" or the "Company"), as well as other regulatory filings and reports and advisories about the Company, press releases, media reports, and other publicly available

1    information.  Plaintiffs believe substantial additional evidentiary support will exist for the allegations

2    set forth herein after a reasonable opportunity for discovery.

3    **I.    NATURE OF THE ACTION**

4         1.    This is a federal securities class action against PacBio and certain of its officers and

5    directors for violations of the federal securities laws.  Plaintiffs bring this action on behalf of all

6    persons or entities that purchased PacBio common stock between October 27, 2010, and September

7    20, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange

8    Act of 1934 (the "Exchange Act").  This action is also brought on behalf of a subclass (the "Subclass")

9    consisting of all persons or entities that purchased PacBio common stock pursuant or traceable to the

10   Company's October 27, 2010 Initial Public Offering (the "IPO" or "Offering"), seeking to pursue

11   remedies under the Securities Act of 1933 (the "Securities Act").

12        2.    PacBio claims to have developed a novel approach to studying the synthesis and

13   regulation of DNA, RNA and proteins. Combining recent advances in nanofabrication, biochemistry,

14   molecular biology, surface chemistry and optics, PacBio has created a powerful technology platform

15   called single molecule, real-time, or SMRT, technology. SMRT technology enables real-time analysis

16   of biomolecules with single molecule resolution, which has the potential to transform the

17   understanding of biological systems by providing a window into these systems that has not previously

18   been open for scientific study. The initial focus of the Company's third generation gene sequencing

19   technology was the PacBio *RS* system, which was supposed to be able produce a complete, high-

20   quality human genome in a very short period of time. This could be utilized for, among other things,

21   cancer research and diagnostics.

22        3.    On or about October 27, 2010, the Company conducted its IPO. The IPO was a

23   financial success for the Company and its underwriters, as they raised $230 million by selling over

24   12.5 million shares of the Company's common stock (before underwriters' overallotment) to investors

25   at a price of $16.00 per share. In connection with the IPO, certain defendants filed a series of

26   Registration Statements and a Prospectus (collectively referred to as the "Offering Materials").[1]

27   
_____

28   [1] The term "Registration Statement" or "Registration Statements" as used herein includes, inter
     alia, the Form S-1 Registration Statement, filed with the SEC on August 16, 2010 (the "Form S-

-2-

1    4.    Throughout the Class Period, the Company and the Officer Defendants (defined

2  herein) knowingly, or with severe recklessness, made materially misleading statements, and/or failed

3  to disclose information necessary to make various statements not materially misleading.  As a result,

4  the price of PacBio common stock remained artificially inflated throughout the Class Period.

5    5.    The truth, however, began to gradually emerge as investors learned that the PacBio *RS*

6  system had a raw read accuracy of only 80% to 85%, not the 99% accuracy rate represented in the

7  Offering Materials. Ultimately, during 2011, investors learned that the *RS* system was riddled with

8  bugs. This fact, combined with a raw read accuracy rate that was unacceptable to many of the

9  Company's customers and a price tag of $700,000, meant that the Company was utterly failing in

10  introducing its product to the market. By August 2011, the Company was reporting revenues far below

11  expectations, and on September 20, 2011, after the close of the market, the Company filed a Form 8-K

12  with the SEC announcing it was reducing its number of employees by approximately 130, or roughly

13  28% of its total workforce.  According to the Form 8-K:

14    The actions taken were in consideration of uncertainties associated with the economic

15    environment and to position the Company for long-term success. The Company's current

16    infrastructure was staffed to support a faster adoption rate for its products. The reduction

17    implemented will allow the Company to continue support of its growing customer base with

18    improved service and continued product enhancements, while at the same time conserving

19    cash.

20    6.    Most alarmingly, "the Company's operations and research and development functions

21  were most effected [sic]."

22    7.    PacBio's stock closed at $5.56 per share on September 20, 2011, prior to the disclosure

23  of the headcount reduction.  The next trading day, September 21, 2011, PacBio stock closed at $4.25

24

25  1"), and the following Amendments to the Form S-1: Amendment No. 1, filed September 17, 2010 ("Amendment No. 1"), Amendment No. 2, filed October 1, 2010 ("Amendment No. 2"), Amendment No. 3, filed October 4, 2010 ("Amendment No. 3"), Amendment No. 4, filed October 18, 2010 ("Amendment No. 4"), Amendment No. 5, filed October 20, 2010 ("Amendment No. 5"), Amendment No. 6, filed October 22, 2010 ("Amendment No. 6"), as well as the Form S-8 filed October 29, 2010 (the "Form S-8"). The term "Prospectus," as used herein, includes the Prospectus filed October 27, 2010 with the SEC, the Preliminary Prospectus dated October 4, 2010, and all other interim versions thereof.

26

27

28

-3-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1  per share, on nearly nine times the previous day's volume.  This decline of $1.31 per share represented

2  a drop of nearly 31% in value in 24 hours, as well as a huge decline of $12.25 per share, or over 75%,

3  from the IPO price of $16.00 per share, less than one year earlier.

4  **II.**          **JURISDICTION AND VENUE**

5         8.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §

6  78j(b) and § 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b 5), as well

7  as Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k,77l(a)(2) and 77o).

8         9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

9  §§ 1331 and 1307, and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the

10  Securities Act (15 U.S.C. § 77v).

11        10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22

12  of the Securities Act, and 28 U.S.C. § 1391(b).  PacBio's principal executive offices are located within

13  this District, many of the acts and practices complained of herein occurred in substantial part in this

14  District, and the Company's IPO was actively marketed in this District..

15        11.     In connection with the acts and omissions alleged in this complaint, Defendants,

16  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

17  limited to, the mails, interstate telephone communications, and the facilities of the national securities

18  markets.

19  **III.**    **THE PARTIES**

20        **Plaintiffs**

21        12.     Lead Plaintiff Thomas J. Primo purchased publicly traded PacBio securities at

22  artificially inflated prices during the Class Period as indicated in the Certification attached hereto, and

23  has been damaged thereby.

24        13.     Plaintiff Evan Powell purchased PacBio securities pursuant and/or traceable to the IPO

25  at artificially inflated prices, and has been damaged thereby.

26        **Defendants**

27        14.     Defendant PacBio is a Delaware corporation with its principal executive offices located

28  at 1380 Willow Road, Menlo Park, California 94025.  The Company was formed in 2000,  and

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1    conducted its IPO on October 27, 2010.  PacBio common shares trade on the NASDAQ under the

2    ticker symbol "PACB."

### Director/Officer

3

4        15.    Defendant Hugh C. Martin ("Martin") was, at all relevant times, the Company's

5    Chairman, President and Chief Executive Officer ("CEO").  Martin continued to serve as the President

6    and CEO of the Company until his resignation from those positions, effective January 5, 2012. Martin

7    is scheduled to resign his position on the PacBio Board of Directors (the "Board") at the upcoming

8    2012 meeting of PacBio's shareholders. Martin joined the Company in 2004.    Defendant Martin

9    signed (directly and/or through an "attorney in fact") the false and misleading Offering Materials,

10   including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

### Officers

11

12       16.    Defendant Susan K. Barnes ("Barnes") was, at all relevant times, the Chief Financial

13   Officer ("CFO") and Executive Vice President of PacBio.  She joined the Company in February 2010.

14   Defendant Barnes signed (directly and/or through an "attorney in fact") the false and misleading

15   Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

16       17.    Defendant Brian B. Dow ("Dow") was, at all relevant times, the Vice President and

17   Principal Accounting Officer of PacBio.  Dow joined the Company in 2010. Defendant Dow signed

18   (directly and/or through an "attorney in fact") certain of the false and misleading Offering Materials,

19   including Amendment Nos. 1 through 6, and the Form S-8.

20       18.    Defendants Martin, Barnes, and Dow are collectively referred to herein as the "Officer

21   Defendants."

### Directors

22

23       19.    Defendant William Ericson ("Ericson") was, at relevant times, a member of the Board.

24   Defendant Ericson signed (directly and/or through an "attorney in fact") the false and misleading

25   Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

26       20.    Defendant Brook Byers ("Byers") was, at relevant times, a member of the Board.

27   Defendant Byers signed (directly and/or through an "attorney in fact") the false and misleading

28   Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

00071898.000.docx

21.     Defendant Michael Hunkapiller ("Hunkapiller") was, at relevant times, a member of the Board. On October 27, 2011, Hunkapiller was appointed as the Executive Chairman of the Board. As of January 5, 2012, Hunkapiller has served as the Company's President and CEO.  Defendant Hunkapiller signed (directly and/or through an "attorney in fact") the false and misleading Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

22.     Defendant Randall Livingston ("Livingston") was, at relevant times, a member of the Board. Defendant Livingston signed (directly and/or through an "attorney in fact") the false and misleading Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S- 8.

23.     Defendant Susan Siegel ("Siegel") was, at relevant times, a member of the Board. Defendant Siegel signed (directly and/or through an "attorney in fact") the false and misleading Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

24.     Defendant David Singer ("Singer") was, at relevant times, a member of the Board. Defendant Singer signed (directly and/or through an "attorney in fact") the false and misleading Offering Materials, including the Form S-1, Amendment Nos. 1 through 6, and the Form S-8.

25.     Defendants Martin, Ericson, Byers, Hunkapiller, Livingston Siegel, and Singer are collectively referred to herein as the "Director Defendants."

### *Underwriters*

26.     Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter of the Company's IPO.  JP Morgan was allotted 35% of the shares to be sold in the IPO and was to receive 35% of the approximately $14 million in underwriting fees. JP Morgan assisted in the preparation and dissemination of the Offering Materials.

27.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was an underwriter of the Company's IPO. Morgan Stanley was allotted 35% of the shares to be sold in the IPO and was to receive 35% of the approximately $14 million in underwriting fees. Morgan Stanley assisted in the preparation and dissemination of the Offering Materials.

28.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO. Deutsche Bank was allotted 20% of the shares to be sold in the IPO and was to

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1    receive 20% of the approximately $14 million in underwriting fees. Deutsche Bank assisted in the

2    preparation and dissemination of the Offering Materials.

3        29.    Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Company's

4    IPO. Piper Jaffray was allotted 10% of the shares to be sold in the IPO and was to receive 10% of the

5    approximately $14 million in underwriting fees. Piper Jaffray assisted in the preparation and

6    dissemination of the Offering Materials.

7        30.    Defendants JPMorgan, Morgan Stanley, Deutsche Bank, and Piper Jaffary are

8    collectively referred to herein as the "Underwriter Defendants."

9    **IV.    CLASS AND SUBCLASS ACTION ALLEGATIONS**

10       31.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3)

11   on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of

12   PacBio between October 27, 2010, and September 20, 2011, inclusive, and were damaged thereby,

13   seeking to pursue remedies under the Exchange Act.  Excluded from the Class are Defendants, the

14   officers and directors of the Company, members of their immediate families and their legal

15   representatives, heirs, successors or assigns and any entity in which Defendants have or had a

16   controlling interest.  Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil

17   Procedure 23(a) and (b)(3) on behalf of a Subclass, consisting of all those who purchased or otherwise

18   acquired PacBio common stock pursuant and/or traceable to the IPO, and were damaged thereby,

19   seeking to pursue remedies under the Securities Act.  Excluded from the Subclass are Defendants, the

20   officers and directors of the Company, members of their immediate families and their legal

21   representatives, heirs, successors or assigns and any entity in which Defendants have or had a

22   controlling interest.

23       32.    The members of the Class are so numerous that joinder of all members is

24   impracticable.  Throughout the Class Period, PacBio common shares were actively traded on the

25   NASDAQ.  As of October 31, 2011, there were 54,812,464 common shares issued and outstanding.

26   The members of the Subclass are also so numerous that joinder of all members is impracticable.  There

27   were over 12.5 million shares of the Company's common stock (before underwriters' overallotment)

28   sold to investors in the IPO.  While the exact number of Class and Subclass members is unknown to

-7-

00071898.000.docx

1   Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that

2   there are hundreds or thousands of members in the proposed Class and Subclass.  Record owners and

3   other members of the Class and Subclass may be identified from records maintained by PacBio or its

4   transfer agent and may be notified of the pendency of this action by mail, using the form of notice

5   similar to that customarily used in securities class actions.

6        33.   Plaintiff Primo's claims are typical of the claims of the members of the Class as all

7   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

8   law that is complained of herein.  Plaintiff Powell's claims are typical of the claims of the members

9   of the Subclass as all members of the Class are similarly affected by Defendants' wrongful conduct in

10   violation of federal law that is complained of herein.

11        34.   Plaintiffs will fairly and adequately protect the interests of the members of the Class

12   and Subclass and have retained counsel competent and experienced in class and securities litigation.

13   Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class or the Subclass.

14        35.   Common questions of law and fact exist as to all members of the Class and the

15   Subclass, and predominate over any questions solely affecting individual members of the Class or the

16   Subclass.  Among the questions of law and fact common to the Class and the Subclass are:

17           (a)   whether the federal securities laws were violated by Defendants' acts as

18   alleged herein;

19           (b)   whether statements made by Defendants to the investing public during the

20   Class Period misrepresented material facts about the business, operations and management of PacBio;

21   and

22           (c)   whether the members of the Class and the Subclass have sustained damages

23   and, if so, the proper measure of damages.

24        36.   A class action is superior to all other available methods for the fair and efficient

25   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

26   damages suffered by individual Class or Subclass members may be relatively small, the expense and

27   burden of individual litigation make it impossible for members of the Class or Subclass to individually

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1  redress the wrongs done to them. There will be no difficulty in the management of this action as a

2  class action.

3  **V.   SUBSTANTIVE SECURITIES ACT ALLEGATIONS**

4      37.    Prior to the IPO, the Company was subsisting primarily on a substantial infusion of

5  cash from venture capital firms such as Kleiner Perkins Caufield & Byers, Mohr Davidow Ventures,

6  Alloy Ventures, and Maverick Capital Ltd., each of which had substantial holdings in PacBio prior to

7  the IPO and representatives on the Company's Board to protect their interests.  These entities and

8  others had infused approximately $370 million into PacBio.  The Company had no revenue except for

9  some small government grants.  The IPO would increase PacBio's capitalization by more than 50%,

10  provide its venture capitalists a recognized market in which to sell their shares, and give those shares a

11  quantifiable dollar value.

12      38.    On or about October 27, 2010, the Company conducted its IPO. The IPO was a

13  financial success for the Company and its underwriters, as they raised $230 million by selling over

14  12.5 million shares of the Company's common stock (before underwriters' overallotment) to investors

15  at a price of $16.00 per share. In connection with the IPO, the defendants prepared, filed and

16  disseminated the Offering Materials.

17  ***Materially False and Misleading***
***Statements Made in the Offering Materials***

18

19      39.    Regarding the Company's overview of operations, the Offering Materials stated:

20  **Overview**

21      We develop, manufacture and market an integrated platform for genetic analysis.
We have developed an approach to study the synthesis and regulation of

22  deoxyribonucleic acid, or DNA. Combining recent advances in nanofabrication,
biochemistry, molecular biology, surface chemistry and optics, we created a technology

23  platform called single molecule, real-time, or SMRT, technology. Our SMRT
technology uses the natural processing power of enzymes, combined with specially

24  designed reagents and detection systems, to record individual biochemical events as they
occur. The ability to observe single molecule events in real time provides the research

25  community with a new tool for investigating basic biochemical processes such as DNA
synthesis. We believe our SMRT technology has the potential to advance scientific

26  understanding by providing a window into biological processes that has not previously
been open.

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

Our initial focus is on the DNA sequencing market where we have developed and introduced a third generation sequencing platform, the PacBio *RS*. We believe that the PacBio *RS*, which uses our proprietary SMRT technology, maintains many of the key attributes of currently available sequencing technologies while solving many of the inherent limitations of previous technologies. Our system provides long readlengths, flexibility in experimental design, fast time to result and is designed to be easy to use. The PacBio *RS* consists of an instrument platform and the proprietary products necessary to run the platform, which we call consumables. Our proprietary consumables are currently comprised of our SMRT Cells and three chemical reagent kits. The system is designed to be integrated into existing laboratory workflows and information systems. Customers that have placed orders for our products include research institutions and commercial companies that plan to use the PacBio *RS* for clinical, basic and agricultural research, drug discovery and development, biosecurity and bio-fuels. Our customers are also interested in a number of other potential applications, including molecular diagnostics, food safety and forensics, which may require us to enhance the capabilities of our current products or develop additional products. To date, we have neither commercially launched nor generated any revenue from our products.

We believe that our SMRT technology has the potential to impact scientific study beyond DNA sequencing. We, and our scientific collaborators, have published a number of peer-reviewed articles in journals including *Science*, *Nature* and *Nature Methods* highlighting the power and potential applications of the SMRT platform. Potential applications that have been demonstrated include the study of chemical and structural modifications of DNA and the processing of ribonucleic acid, or RNA, and proteins, although these applications will not be available at commercial launch of the PacBio *RS*. We plan to provide these additional capabilities through enhancements to software and consumables without modifications to the PacBio *RS* hardware.

**Evolution of Sequencing**

Recent advances in the understanding of biological complexity have highlighted the need for new tools to study DNA, RNA and proteins. In the field of DNA sequencing, incremental technological advances have provided novel insights into the structure and function of the genome. The International Human Genome Project, designed to map the human genome, took 13 years at a cost of over $3 billion and resulted in only approximately 92% coverage of the genome at its conclusion in 2004. The project generated many important insights regarding human biology, including a reduction in the number of estimated genes in the human genome from 100,000 or more to approximately 23,000. Despite these advances, researchers have not been able to fully characterize the human genome due to inherent limitations in existing technologies.

First generation DNA sequencing, also called "Sanger sequencing," was introduced in 1977 and has gradually grown into a $600 million market. Under standard conditions, this method results in average readlength, defined as the number of individual bases identified contiguously, of approximately 700 bases, but may be extended to 1,000 bases. These are relatively long readlengths compared with other sequencing methods.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

However, first generation sequencing is limited by the small amounts of data that can be processed per unit of time, referred to as throughput. The limited throughput of first generation sequencing technologies constrains the ability of researchers to sequence the large amounts of genetic material needed to unravel the complexities of many biological processes. Second generation sequencing emerged in 2005 to address the issue of limited throughput. Since introduction, the market for these sequencing tools has grown rapidly and is currently estimated to be $600 million. Second generation technologies rely on polymerase chain reaction, or PCR, amplification to generate numerous copies of a DNA sample to provide sufficient signal for detection. This amplification process can introduce errors in the DNA sequence known as amplification bias. In addition to introducing errors in the sequence, the process of amplification increases the complexity and time associated with sample preparation. Second generation tools are also characterized by a "flush and scan" sequencing process that, for many commercial second generation systems, results in long run times and decreased readlengths. The "flush and scan" sequencing process involves sequentially flushing in reagents, such as labeled nucleotides, incorporating the labeled nucleotides into the DNA strands, stopping the incorporation reaction, washing out the excess reagent, scanning to identify the incorporated base by virtue of the incorporated label and finally treating that base so that the strand is ready for the next "flush and scan" cycle. This repetitive process limits the average readlength produced by most second generation systems under standard sequencing conditions to approximately 35 to 400 bases. Long run times limit the flexibility of researchers to conduct experiments and short readlengths complicate the reassembly of sequences and the identification of disease-related variations in the genetic sequence.

**Our Solution**

We have developed a technology platform that enables single molecule, realtime, or SMRT, detection of biological processes. Based on our proprietary SMRT technology, we have introduced a third generation DNA sequencing system, the PacBio *RS* , that addresses many of the limitations of the first and second generation technologies and may also enable other types of biological research. The DNA sequencing market is expected to grow from $1.2 billion in 2009 to more than $3.6 billion by 2014 according to a report commissioned on our behalf and conducted by Scientia Advisors, a life sciences consulting firm. The growth in this market is expected to be driven by increases in the demand for sequencing products from both research institutions and commercial companies, including genome centers, government and academic institutions, genomic service providers, pharmaceutical companies and agriculture companies.

Three key innovations underlie our SMRT technology platform:

- *The SMRT Cell.* Our DNA sequencing is performed on proprietary SMRT Cells, each having an array of approximately 75,000 zero mode waveguides, or ZMWs. Each ZMW is a hole, tens of nanometers in diameter, which allows for limited penetration of focused laser light, creating a 30 nanometer observation window. Within this window, a DNA polymerase is immobilized on the surface of the ZMW and exposed to phospholinked nucleotides, allowing us to view labeled

-11-

00071898.000.docx

nucleotides being added into a growing DNA strand within the ZMW through the visualization of a fluorescent signal, or tag, associated with the nucleotide that is being added. The current immobilization process randomly distributes polymerases into ZMWs across the SMRT Cell, resulting in approximately one-third of the ZMWs being available for use.

▪ *Phospholinked nucleotides*. Our SMRT technology requires the use of our proprietary phospholinked nucleotides. These nucleotides have a fluorescent dye attached to the phosphate chain of the nucleotide rather than to the base, as is the case with other technologies. During the synthesis process, the phosphate chain is cleaved when the nucleotide is incorporated into the DNA strand. The DNA polymerase naturally frees the dye molecule from the nucleotide when it cleaves the phosphate chain leaving a completely natural piece of DNA with no evidence of labeling remaining. This removes the need for a "flush and scan" method as used in second generation sequencing, enabling long readlengths.

▪ *The PacBio RS.* The PacBio *RS* is an instrument that conducts, monitors and analyzes single molecule biochemical reactions in real time. The instrument includes high performance optics, automated liquid handling, a touchscreen control interface, a computational Blade Center and software. The PacBio *RS* uses a high numerical aperture objective lens and four single-photon sensitive cameras to collect light emitted by fluorescent reagents allowing the observation of biological processes, such as the incorporation of labeled nucleotides during DNA synthesis. These observations are recorded as the biochemical events occur. An optimized set of algorithms is then used to translate this data into biologically relevant information, such as the composition of DNA strands known as base calls.

Our sequencing system includes the PacBio *RS* instrument and proprietary consumables, including SMRT Cells and reagent kits, providing a complete solution to the customer. A comprehensive informatics tools suite enabling users to generate finished sequence data is also included. The workflow begins with customers isolating their DNA samples of interest, which can come from a variety of sources, including humans, plants or animals, based on the nature of their scientific study. They then use our reagent kits to convert their DNA sample into a format that is compatible with our system. After loading their sample into the PacBio *RS* , they start the instrument run and real-time sequencing is performed. Our software is used for experimental design, instrument operation and interpretation of results.

We have instituted a limited production release program pursuant to which we have received orders for eleven limited production release instruments. Our limited production release customers include genome centers, clinical, government and academic institutions and an agricultural company. As of September 15, 2010, we have shipped a total of seven PacBio *RS* limited production release instruments, and we intend to ship the remaining four this year. Generally, each of these customers is obligated to pay us a deposit after accepting a limited production release instrument, and is entitled to receive an upgrade to a commercial release version of the PacBio RS, at which time each customer will be obligated to pay the balance of their order and we will then recognize

00071898.000.docx

revenue. As of June 30, 2010, our backlog was approximately $15 million, which includes both orders for limited production release instruments and full commercial release instruments received as of that date. We expect to deliver all orders in our backlog by December 31, 2011, however we do not expect to recognize revenue on any orders prior to December 31, 2010. The commercial launch of our first products is scheduled for early 2011. We cannot provide assurance that we will recognize revenue from these customers.

All of our revenue to date has been generated from government grants.

**SMRT Sequencing Advantages**

Sequencing based on our SMRT technology offers the following key benefits: phosphate chain is cleaved when the nucleotide is incorporated into the DNA strand. The DNA polymerase naturally frees the dye molecule from the nucleotide when it cleaves the phosphate chain leaving a completely natural piece of DNA with no evidence of labeling remaining. This removes the need for a "flush and scan" method as used in second generation sequencing, enabling long readlengths.

■ *The PacBio RS*. The PacBio *RS* is an instrument that conducts, monitors and analyzes single molecule biochemical reactions in real time. The instrument includes high performance optics, automated liquid handling, a touchscreen control interface, a computational Blade Center and software. The PacBio *RS* uses a high numerical aperture objective lens and four single-photon sensitive cameras to collect light emitted by fluorescent reagents allowing the observation of biological processes, such as the incorporation of labeled nucleotides during DNA synthesis. These observations are recorded as the biochemical events occur. An optimized set of algorithms is then used to translate this data into biologically relevant information, such as the composition of DNA strands known as base calls.

■ *Single molecule, real-time analysis*. The ability to observe single molecules in real time combined with long readlength allows our system to observe structural and cell type variation that present challenges for existing short read technologies. Unlike many other sequencing platforms, minimal amounts of reagent and sample preparation are required, and the sequencing reaction does not involve a time-consuming "flush and scan" process. In addition, our system does not require the routine PCR amplification needed by most second generation sequencing systems, thereby avoiding systematic amplification bias.

■ *Longer readlengths*. Our SMRT technology enables longer readlengths than most other commercially available sequencing methods largely due to the reagents and detection methods that we employ. Our technology uses a genetically modified DNA polymerase that maintains the natural processing activity of the polymerase while operating at a slower speed, enabling accurate detection of labeled nucleotides as they are added to a growing DNA strand. In nature, molecular events are intrinsically random, leaving uncertainty in the possible readlength of a particular sequencing reaction. Since our approach uses the natural processing

activity of the polymerase, it produces a distribution of readlengths. We have demonstrated readlengths greater than 1,000 base airs on average with instances of over 10,000 base pairs. We believe that the long readlengths produced by our SMRT technology will allow insights into biology that are not possible with existing technologies.

- *Faster time to result.* With the PacBio *RS* , sample preparation to sequencing results can take less than one day. A typical sequencing run can require as little as 30 minutes of instrument time. This speed enables the research community to ask and answer questions much faster than with existing technologies which often take multiple days to produce results. This fast time to result may have important implications for applications where speed is of critical importance such as infectious disease monitoring and molecular pathology.

- *Ease of use.* We believe our system is easy to use and adopt because it is compatible with existing lab workflows and informatics infrastructures. Our SMRTbell sample preparation protocol is designed to be simple and fast. It can be used with a variety of sample types and can output a range of DNA lengths. The PacBio *RS* is equipped with a touchscreen interface and requires minimal user intervention.

- *Flexibility and granularity.* The PacBio *RS* system enables the user to optimize performance based on the needs for a particular project. The system also has the ability to scale the throughput and cost of sequencing across a range of small and large projects. We call this granularity, and it results from our flexible consumables format. The ability to run a single SMRT Cell, or batch multiple SMRT Cells in a single run, provides flexibility in experiment design and implementation.

- *Ability to observe and capture kinetic information.* The ability to observe the activity of a DNA polymerase in real time enables the PacBio *RS* to collect, measure and assess the dynamics and timing of nucleotides being added to a growing DNA strand, referred to as kinetics. It is well established in the scientific community that chemical modification of DNA, such as the addition of a methyl group, known as methylation, can alter the biological activity of the affected nucleotide. The presence or absence of a methyl group can determine whether or not a gene is expressed in a particular cell, tissue or organism. The impact of such chemical modification of DNA on the expression of genes has been hypothesized to play a role in many diseases, including cancer. Importantly, it has been shown that changes in kinetics may reflect the presence of DNA methylation. The PacBio *RS* detects changes in kinetics automatically by capturing and recording changes in the duration of, and distances between, each of the fluorescent pulses during a typical sequencing analysis. We and our collaborators have demonstrated that this information may be a sensitive measure of chemical modification of nucleotides such as methylation. Although the PacBio *RS* currently records the information required to perform this analysis during a standard sequencing run, we plan to offer kinetic detection analysis as an application through future software and consumable upgrades. First and second generation sequencing systems are unable to accurately record this type of kinetic data because the "flush and

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

scan" sequencing process disrupts the timing of the natural incorporation process. In addition, the use of multiple molecules prevents this information from being collected as it cannot be observed in aggregate.

\*                        \*                        \*

**Pacific Biosciences' Strategy**

We plan to execute the following strategy:

- ▪ ***Define the future of biological analysis based on SMRT technology.*** Our SMRT technology provides a window into biological processes that has not previously been available. We have and will continue to communicate the benefits and advantages of our SMRT technology platform through our commercial and marketing activities. In addition, we will continue to pursue publication of biological insights using our SMRT technology in top-tier scientific, peer-reviewed journals. For example, a recent publication in Nature demonstrated the broad applicability of the SMRT detection technology by enabling new, high resolution insights into ribosome function and composition during translation at physiological concentrations of transfer RNAs. We plan to continue to develop the applications of our SMRT technology in the fields of DNA, RNA and protein biology.

- ▪ ***Focus initially on the DNA sequencing market***. We will initially sell our products into the rapidly growing DNA sequencing market. We believe our third generation sequencing technology will address most of the limitations in current sequencing technologies and enable a wide range of experiments and applications. We believe that the introduction of the PacBio *RS* will expand the market for genetic analysis tools. Customers that have placed orders for our products include research institutions and commercial companies that plan to use the PacBio *RS* for clinical, basic and agricultural research, drug discovery and development, biosecurity and bio-fuels. Our customers are also interested in a number of other potential applications, including molecular diagnostics, food safety and forensics, which may require us to enhance the capabilities of our current products or develop additional products.

- ▪ ***Continually enhance product performance to increase market share***. The design of the PacBio *RS* will allow for significant performance improvements without an upgrade or replacement of the instrument hardware. These performance enhancements will be delivered through software upgrades and new consumables. Our flexible platform is designed to generate a recurring revenue stream through the sale of proprietary SMRT Cells and reagent kits. Our research and development efforts are focused on product enhancements to reduce DNA sequencing cost and time as well as expand capabilities. We believe that our ability to offer performance improvements without requiring new hardware investment by our customers will increase the attractiveness of our products.

- ▪ ***Leverage platform to develop and launch additional applications.*** We plan to leverage our SMRT technology platform to develop new applications targeting kinetic detection, RNA transcription monitoring, RNA sequencing, protein translation and

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

ligand binding. We believe these applications will create substantial new markets for our technology.

- **Create a global community of users to enhance informatics capabilities and drive adoption of our products.** We have worked closely with members of the informatics community to develop and define standards for working with single molecule, real-time sequence data. We have launched the PacBio DevNet, a software developer's open network to support academic informatics developers, life scientists and independent software vendors interested in creating tools to work with our third generation sequencing data. This gives the user flexibility to perform further analysis of the sequencing data through third-party software or share data with collaborators. To maximize the flexibility and functionality for all users, all of the secondary analysis algorithms are open source.

\*          \*          \*

**Research and Development**

\*          \*          \*

We will continue to invest in research and development to support the ongoing development of chemistry components and protocols to enhance overall system performance. Our goals are to continuously improve sequencing readlength, raw read accuracy and the number of reactions on each SMRT Cell, as well as to develop and introduce into the marketplace new applications that will take full advantage of our single molecule, real-time detection technology. In addition, our engineering teams will continue their focus on increasing instrument component and system reliability, reducing costs, increasing sample throughput and implementing additional system flexibility and versatility.

40.    Additionally with respect to the underlying science for its products, the Offering Materials stated:

**Evolution of Biology**

*Classical Biology*

Genetic inheritance in living systems is conveyed through a naturally occurring information storage system known as deoxyribonucleic acid, or DNA. DNA stores information in a linear sequence of the chemical bases adenine, cytosine, guanine and thymine, represented by the symbols, A, C, G and T. These bases are attached to a repeating linear chain made up of alternating sugar and phosphate segments. Inside living cells, these chains usually exist in pairs bound together in a double helix by complementary bases, with A of one strand always binding to a T of the other strand and C always binding to G.

In humans, there are approximately three billion DNA base-pairs in the molecular blueprint of life, called the genome. These three billion bases are divided into

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

23 chromosomes ranging in size from 50 million to 250 million bases. Normally, there are two complete copies of the genome contained in each cell, one of maternal origin and the other of paternal origin. When cells divide, the genomes are replicated by an enzyme called the DNA polymerase, which visits each base in the sequence, creating a complementary copy of each chromosome using building blocks called nucleotides. Contained within these chromosomes are approximately 23,000 smaller regions, called genes, each one containing the recipe for a protein or group of related proteins. The natural process of protein production takes place in steps. In a simplified model, the first step is transcription, a process in which an enzyme called the RNA polymerase converts the DNA strand base for base into an RNA message or mRNA. The mRNA carries the same sequence as the DNA, except that the DNA base thymine is replaced by uracil, so that the RNA alphabet is A, C, G and U. These messages are taken to the cellular protein factories, called ribosomes, for translation into proteins. These proteins go on to play crucial roles in the structure and function of the cell, including the regulation and execution of transcription and translation. The characterization of these events as a simple multi-step linear process from DNA to RNA to protein has been referred to as the Central Dogma of Molecular Biology and has formed the backbone of classical biology.

The linear process implied by the Central Dogma led to the development of tools that focused on isolated elements of living systems. These tools collect data reflecting averages of isolated events at static points in time, missing many of the complex dynamics and biological contexts critical to a full understanding of biological processes. Therefore, the study of biology is predisposed towards incomplete and deterministic pictures of biological systems.

Based on the Central Dogma, a common expectation developed that once the full genetic code of a human was available, the mechanisms of human biology would be substantially revealed. The International Human Genome Project, designed to map the human genome, took 13 years at a cost of over $3 billion and resulted in only approximately 92% coverage of the genome at its conclusion in 2004. The project resulted in many important insights regarding human biology, including a reduction in the number of estimated genes in the human genome from 100,000 or more to approximately 23,000. The data analysis techniques available at the time were able to identify single-nucleotide polymorphisms, or SNPs, places in the genome where individuals commonly differ by a single letter. This resulted in a view that there is a "reference genome" approximating all humans, with SNPs representing the dominant source of genetic variation. This view fostered an expectation that a new era of diagnosing and treating disease would emerge.

However, this promise has not been delivered due to our incomplete understanding of biological mechanisms underlying human disease. With the expectation that knowledge of the genome would guide the process towards safe and effective drugs, the pharmaceutical industry has spent billions of dollars on high-throughput screening of potential drug compounds without a significant increase in research productivity. Today, biological science remains largely unable to effectively determine which proteins should be targeted in order to treat disease.

Numerous scientific approaches have evolved to adapt to the emerging awareness of the magnitude of complexity embedded in biological systems. The field of genomics developed to study the interactions among components in the genome, and the massive quantities of associated data. Subsequently, proteomics, transcriptomics and a number of other related fields emerged.

The genomics research community has realized that a single reference sequence is not sufficient to decipher the inner workings of life. This led to a new type of study, commonly called genome-wide association studies, or GWAS, in which the genomes of large numbers of individuals are checked at known SNPs, and these findings are correlated with specific conditions, such as disease. While these studies have advanced our general understanding, in most cases they have not improved diagnosis and treatment as hoped. The correlations found by these methods are generally not large enough to be useful in detecting or treating human disease. Further, the research community has developed a deeper appreciation for the importance of additional sources of genomic variation, including chemical, structural and functional genomic modifications.

### Future Biology

Advances in biology over the next decade are expected to be shaped by a more detailed understanding of the fundamental complexity of biological systems. These systems vary among individuals in previously unrecognized ways and are influenced by factors including time, molecular interactions and cell type.

Importantly for the future of genomics, the first few whole-genome sequencing studies of disease have shown that rare mutations play a critical role in human disease. These mutations would not have been detected in GWAS because too few people, or perhaps only one person, carry the specific mutation. In addition, it is now understood that structural changes to the genome in which whole sections are deleted, inverted, copied or moved may be responsible for a significant fraction of variation among individuals. The scope of these structural changes challenges the very idea of a reference genome.

Differences between genomes at different positions can be highly interactive, for example, a mutation that increases lifetime risk of cancer in one genomic context may decrease risk in another context. While the two copies of the 23 chromosomes we inherit from our parents are enormously important in determining who we are, our genomes continue to change as we age. Understanding the genetic makeup of an individual, including mutations that take place after conception, is key to understanding and treating diseases. For example, the genomes of cells within a particular individual's tumor may show significant variation from one cell to the next and from one time-point to the next.

Recent discoveries have highlighted additional complexities in the building blocks of DNA (A, C, G and T) and RNA (A, C, G and U), including the presence of additional bases. It has long been known that in humans and many other multicellular organisms the C bases can be chemically modified through the addition of a methyl group in a process called methylation. These chemical modifications have been shown to play a role in embryonic development, have important impacts on diseases such as

-18-

00071898.000.docx

cancer and can even affect the characteristics of offspring for multiple generations. More recently, it has been discovered that other bases, such as hydroxymethylcytosine, or hmC, 8-Oxoguanine and many others, play important physiological roles. In RNA, dozens of chemical modifications play important roles in cellular function.

Another source of complexity derives from the processing of RNA molecules after being transcribed from the genome. The majority of all genes have different forms of the protein that can be made depending on the structure of the RNA molecule, referred to as splice variants. A detailed understanding of both the expression pattern and regulation of these variants is believed to play an important role in a number of critical biological processes.

It is now understood that the role of RNA as detailed in the Central Dogma requires significant revision. The RNA components of the cell, which were originally thought only to relate to the production of proteins, are now known to play important regulatory roles. Numerous functional elements have been identified and located in regions far from any protein-coding sequence, many with no indications of how they might function. Not surprisingly, significant discrepancies have been found between the levels of mRNAs and the levels of the proteins for which they code. This is caused by regulation of the translation process that takes place after the mRNA is made. For example, binding of short RNA segments called micro-RNAs or miRNAs to mRNA have been shown to inhibit translation of their mRNA target.

Recent advances in our understanding of biological complexity have highlighted the need for new tools to study DNA, RNA and proteins. In the field of DNA sequencing incremental technological advances have provided novel insights into the structure and function of the genome. Despite these advances, researchers have not been able to fully characterize the human genome because of inherent limitations in these tools.

41.     With respect to the significance and technology of DNA "sequencing," the Offering Materials stated:

**Evolution of Sequencing**

In order to understand the limitations of current DNA sequencing technologies, it is important to understand the sequencing process. This consists of three phases comprising sample preparation, physical sequencing and re-assembly. The first step of sample preparation is to break the target genome into multiple small fragments.

Depending on the amount of sample DNA, these fragments may be amplified into multiple copies using a variety of molecular methods. In the physical sequencing phase, the individual bases in each fragment are identified in order, creating individual reads. The number of individual bases identified contiguously is defined as readlength. In the re-assembly phase, bioinformatics software is used to align overlapping reads, which allows the original genome to be assembled into contiguous sequence. The longer the readlength the easier it is to reassemble the genome. The ability to use sequence-based information is contingent not only on assembly, but the accuracy of the assembled sequence. There are two principal forms of accuracy that are commonly cited, referred to

as raw read accuracy and finished or consensus accuracy. The former can be a platform specific performance metric while consensus accuracy is critical to successful reassembly.

### First Generation Sequencing

First generation sequencing, also called "Sanger sequencing," was originally developed by Frederick Sanger in 1977. With this technology, during sample preparation, scientists first make different sized fragments of DNA each starting from the same location. Each fragment ends with a particular base that is labeled with one of four fluorescent dyes corresponding to that particular base. Then all of the fragments are distributed in order of their length by driving them through a gel. Information regarding the last base is used to determine the original sequence. Under standard conditions, this method results in a readlength that is approximately 700 bases on average, but may be extended to 1,000 bases. These are relatively long readlengths compared with other sequencing methods. However, first generation sequencing is limited by the small amounts of data that can be processed per unit of time, referred to as throughput.

### Second Generation Sequencing

Commercial second generation DNA sequencing tools emerged in 2005 in response to the low throughput of first generation methods. To address this problem, second generation sequencing tools achieve much higher throughput by sequencing a large number of DNA molecules in parallel. In order to generate this large number of DNA molecules, a copying method called PCR amplification is required. This amplification process can introduce errors known as amplification bias. The effect of this bias is that the resulting copies are not uniformly representative of the original template DNA. In addition to introducing errors in the sequence, the process of amplification increases the complexity and time associated with sample preparation.

In most second generation tools, tens of thousands of identical strands are anchored to a given location to be read in a process consisting of successive flushing and scanning operations. The "flush and scan" sequencing process involves sequentially flushing in reagents, such as labeled nucleotides, incorporating nucleotides into the DNA strands, stopping the incorporation reaction, washing out the excess reagent, scanning to identify the incorporated base and finally treating that base so that the strand is ready for the next "flush and scan" cycle. This cycle is repeated until the reaction is no longer viable.

Due to the large number of flushing, scanning and washing cycles required, the time to result for second generation methods is generally long, usually taking days. This repetitive process also limits the average readlength produced by most second generation systems under standard sequencing conditions to approximately 35 to 400 bases. The array of DNA anchor locations can have a high density of DNA fragments, leading to extremely high overall throughput and a resultant low cost per identified base when the machine is run at high capacity. However, the disadvantages of second generation sequencing include short readlength, complex sample preparation, the need for amplification, long time to result, the need for many samples to justify machine operation and significant data storage and interpretation requirements.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

First and second generation sequencing technologies have led to a number of scientific advances. However, given the inherent limitations of these technologies, researchers still have not been able to unravel the complexity of genomes.

42.    With respect to the Company's development of a third generation of DNA sequencing technology that would reduce or eliminate the limitations of first and second generation sequencing technology, the Offering Materials stated:

**Pacific Biosciences' Solution — The Third Generation**

We have developed a technology platform that enables single molecule, real-time, or SMRT, detection of biological processes. Our SMRT technology harnesses the natural activity of key enzymes involved in the synthesis and regulation of biomolecules including DNA, RNA and protein. We have introduced a third generation DNA sequencing system, the PacBio RS, that addresses many of the limitations of the first and second generation technologies, including short readlengths, limited flexibility, long time to result, lower throughput, complex sample preparation and risk of amplification bias, and may also enable other types of biological research, including kinetic detection, RNA transcription monitoring, RNA sequencing, protein translation and ligand binding. We refer to this new paradigm of study as SMRT Biology.

***Pacific Biosciences' SMRT Technology***

Our SMRT technology harnesses the natural process of DNA replication, which in nature is a highly efficient and accurate process. The enzyme responsible for replicating DNA in nature is called the DNA polymerase. The DNA polymerase attaches itself to a strand of DNA to be replicated, examines the individual base at the point it is attached, and then determines which of four building blocks, or nucleotides, is required to replicate that individual base. After determining which nucleotide is required, the polymerase incorporates that nucleotide into the growing strand that is being produced. After incorporation, the enzyme advances to the next base to be replicated and the process is repeated.

Our SMRT technology enables the observation of DNA synthesis as it occurs in real time. To overcome the challenges inherent in observing an enzyme that is 15 nanometers, or nm, in diameter running in real time, we developed three key innovations:

- The SMRT Cell

- Phospholinked nucleotides

- The PacBio *RS*

***The SMRT Cell***

One of the fundamental challenges with observing a DNA polymerase working in real time is the ability to detect the incorporation of a single nucleotide, taken from a

-21-

00071898.000.docx

large pool of potential nucleotides, during DNA synthesis. To resolve this problem, we applied the same principle that operates in the metallic screen of a microwave oven door. In a microwave oven, the screen is perforated with holes that are much smaller than the wavelength of the microwaves. Because of their relative size, the holes prevent the much longer microwaves from passing through and penetrating the glass. However, the much smaller wavelength visible light is able to pass through the holes in the screen, allowing food to be visible. We have reduced this same principle to the nanoscale and we call our innovation a zero-mode waveguide, or ZMW

A ZMW is a hole, tens of nanometers in diameter, fabricated in a 100nm metal film deposited on a glass substrate. The small size of the ZMW prevents visible laser light, which has a wavelength of approximately 600nm, from passing entirely through the ZMW. Rather than passing through, the light exponentially decays as it enters the ZMW. Therefore, by shining a laser through the glass into the ZMW, only the bottom 30nm of the ZMW becomes illuminated. Within each ZMW, a single DNA polymerase molecule is anchored to the bottom glass surface using a proprietary technique. Nucleotides, each type labeled with a different colored fluorophore, are then flooded above an array of ZMWs at the required concentration. Diffusion at the nanoscale is incredibly fast. Within microseconds, labeled nucleotides travel down into the ZMW, surround the DNA polymerase, then diffuse back up and exit the hole. As no laser light penetrates up through the holes to excite the fluorescent labels, the labeled nucleotides above the ZMWs are dark. Only when they diffuse through the bottom 30nm of the ZMW do they fluoresce. When the correct nucleotide is detected by the polymerase, it is incorporated into the growing DNA strand in a process that takes milliseconds in contrast to simple diffusion which takes microseconds. This difference in time results in higher signal intensity for incorporated versus unincorporated nucleotides, which creates a high signal-to-noise ratio. Thus, the ZMW has the ability to detect a single incorporation event against the background of fluorescently labeled nucleotides at biologically relevant concentrations.

Our DNA sequencing is performed on proprietary SMRT Cells, each having an array of approximately 75,000 ZMWs. Each ZMW is capable of containing a DNA polymerase loaded with a different strand of DNA sample. As a result, the SMRT Cell enables the potential detection of approximately 75,000 single molecule sequencing reactions in parallel. Currently, our immobilization process randomly distributes polymerases into ZMWs across the SMRT Cell, resulting in only approximately one-third of the ZMWs being available for use.

***Phospholinked Nucleotides***

Previous labeling technologies for nucleotides attach a fluorescent label to the base of the nucleotide, which is incorporated into the DNA strand. This is problematic for any system attempting to observe DNA synthesis in real time because the dye's large size relative to the DNA can interfere with the activity of the DNA polymerase. In second generation sequencing, a DNA polymerase can incorporate only a few base-labeled nucleotides before it halts. Our proprietary phospholinked nucleotides have a fluorescent dye attached to the phosphate chain of the nucleotide rather than to the base. As a natural step in the synthesis process, the phosphate chain is cleaved when the

-22-

nucleotide is incorporated into the DNA strand. Thus, upon incorporation of a phospholinked nucleotide, the DNA polymerase naturally frees the dye molecule from the nucleotide when it cleaves the phosphate chain. Upon cleaving, the label quickly diffuses away, leaving a completely natural piece of DNA with no evidence of labeling remaining.

### The PacBio RS

The PacBio *RS* is an instrument that conducts, monitors and analyzes single molecule biochemical reactions in real time. The PacBio *RS* uses a high numerical aperture objective lens and four single-photon sensitive cameras to collect the light pulses emitted by fluorescent reagents allowing the observation of biological processes. An optimized set of algorithms is used to translate the information that is captured by the optics system. Using the recorded information, light pulses are converted into either an A, C, G or T base call with associated quality metrics. Once sequencing is started, the real-time data is delivered to the system's primary analysis pipeline, which outputs base identity and quality values, or QVs. To generate a consensus sequence from the data, an assembly process aligns the different fragments from each ZMW based on common sequences.

### Putting the Three Innovations Together

Our three innovative technologies work together to allow researchers to sequence long reads of DNA in minutes. As discussed above, the DNA polymerase is immobilized on the floor of the ZMW. Phospholinked nucleotides are introduced into the SMRT Cell from above. As the phospholinked nucleotides diffuse through the bottom 30nm of each ZMW in the SMRT Cell, the PacBio *RS* detects the presence of free nucleotides as low intensity flashes of light. When the DNA polymerase encounters the nucleotide complementary to the next base in the template, it is incorporated into the growing DNA chain. During incorporation, the DNA polymerase holds the nucleotide for tens of milliseconds, orders of magnitude longer than the average diffusing nucleotide. While held by the polymerase, the fluorescent label emits colored light. The PacBio *RS* detects this as a higher intensity flash of light whose color corresponds to the base identity, which is recorded. Upon incorporation, the fluorescent label is cleaved and the signal immediately returns to baseline and the process repeats, with the DNA polymerase continuing to incorporate multiple bases per second.

43. With respect to the benefits of sequencing with the Company's *RS* system using SMRT technology, the Offering Materials stated:

- *Single molecule, real-time analysis.* The ability to observe single molecules in real time combined with long readlength allows our system to observe structural and cell type variation that present challenges for existing short read technologies. Unlike many other sequencing platforms, minimal amounts of reagent and sample preparation are required, and the sequencing reaction does not involve a time-consuming "flush and scan" process. In addition, our system does not require the routine PCR amplification needed by most second generation sequencing systems, thereby avoiding

-23-

systematic amplification bias.

- *Longer readlengths.*  Our SMRT technology enables longer readlengths than most other commercially available sequencing methods largely due to the reagents and detection methods that we employ. Our technology uses a genetically modified DNA polymerase that maintains the natural processing activity of the polymerase while operating at a slower speed, enabling accurate detection of labeled nucleotides as they are added to a growing DNA strand. In nature, molecular events are intrinsically random, leaving uncertainty in the possible readlength of a particular sequencing reaction. Since our approach uses the natural processing activity of the polymerase, it produces a distribution of readlengths. We have demonstrated readlengths greater than 1,000 base pairs on average with instances of over 10,000 base pairs. We believe that the long readlengths produced by our SMRT technology will allow insights into biology that are not possible with existing technologies.

- *Faster time to result.*  With the PacBio *RS*, sample preparation to sequencing results can take less than one day. A typical sequencing run can require as little as 30 minutes of instrument time. This speed enables the research community to ask and answer questions much faster than with existing technologies which often take multiple days to produce results. This fast time to result may have important implications for applications where speed is of critical importance such as infectious disease monitoring and molecular pathology.

- *Ease of use.*  We believe our system is easy to use and adopt because it is compatible with existing lab workflows and informatics infrastructures. Our SMRTbell sample preparation protocol is designed to be simple and fast. It can be used with a variety of sample types and can output a range of DNA lengths. The PacBio *RS* is equipped with a touchscreen interface and requires minimal user intervention.

- *Flexibility and granularity.*  The PacBio *RS* system enables the user to optimize performance based on the needs for a particular project. The system also has the ability to scale the throughput and cost of sequencing across a range of small and large projects. We call this granularity, and it results from our flexible consumables format. The ability to run a single SMRT Cell, or batch multiple SMRT Cells in a single run, provides flexibility in experiment design and implementation.

- *Ability to observe and capture kinetic information.*   The ability to observe the activity of a DNA polymerase in real time enables the PacBio *RS* to collect, measure and assess the dynamics and timing of nucleotides being added to a growing DNA strand, referred to as kinetics. It is well established in the scientific community that chemical modification of DNA, such as the addition of a methyl group, known as methylation, can alter the biological activity of the affected nucleotide. The presence or absence of a methyl group can determine whether or not a gene is expressed in a particular cell, tissue or organism. The impact of such chemical modification of DNA on the expression of genes has been hypothesized to play a role in many diseases, including cancer. Importantly, it has been shown that changes in kinetics may reflect the presence of DNA methylation. The PacBio *RS* detects changes in kinetics automatically by capturing and recording changes in the duration of, and distances

-24-

between, each of the fluorescent pulses during a typical sequencing analysis. We and our collaborators have demonstrated that this information may be a sensitive measure of chemical modification of nucleotides such as methylation. Although the PacBio *RS* currently records the information required to perform this analysis during a standard sequencing run, we plan to offer kinetic detection analysis as an application through future software and consumable upgrades. First and second generation sequencing systems are unable to accurately record this type of kinetic data because the "flush and scan" sequencing process disrupts the timing of the natural incorporation process. In addition, the use of multiple molecules prevents this information from being collected as it cannot be observed in aggregate.

44.     Regarding the Company's products, the Offering Materials stated:

**Our Products**

We are preparing to enter the market with our first product, the PacBio *RS*, a third generation sequencing instrument that provides real-time information at the single molecule level. The initial application for the system is DNA sequencing, and the architectural design of the system will enable a broader range of applications over time. The instrument is designed for expandable capability to permit performance improvements and new applications to be delivered through chemistry and software enhancements without changes to the hardware.

The PacBio *RS* is compatible with existing customer infrastructure, from sample preparation to biological results and analysis. This includes our SMRTbell sample preparation protocol, remote experimental management, touchscreen instrument operation, integration with preferred IT infrastructures and backwards-compatibility with existing informatics pipelines. Together, this results in quick system setup times, fast scaling to multi-unit configurations and short turnover time between experiments. We believe these factors will result in a new paradigm for sequencing experiments from days and weeks to minutes and hours.

Our sequencing system includes the PacBio *RS* instrument and proprietary consumables, including SMRT Cells and reagent kits, providing a complete solution to the customer.

***The PacBio RS***

The PacBio *RS* is an instrument that conducts, monitors and analyzes biochemical sequencing reactions. The instrument is an integrated unit that includes high performance optics, automated liquid handling, a touchscreen control interface, a computational Blade Center and software. The instrument's high performance optics monitor the thousands of ZMWs in real time. The automated liquid handling robotics perform reagent mixing and prepare SMRT Cells. The instrument's touchscreen control interface, the *RS* Touch, is the user's primary control center to design and monitor experiments as they occur in real time. The Blade Center is the computational brain of the PacBio *RS,* responsible for the secondary processing of the sequencing data being produced on the SMRT Cells. . . . ***The PacBio RS has been designed to allow for performance improvements without an upgrade or replacement of the instrument***

-25-

*hardware. These performance enhancements will be delivered through software upgrades and new consumables. A comprehensive informatics tools suite that enables users to generate finished sequence data is also included.* The list price for the PacBio *RS* will be $695,000 in the United States. [Emphasis added.]

45.     With respect to the utility of the PacBio *RS* system, the Offering Materials stated:

**Using the PacBio *RS***

The PacBio *RS* delivers a complete product solution from sample preparation to biological results. The instrument has the capability for multiple sequencing protocols, enabling a high degree of flexibility in experimental design.

- Standard sequencing.  The standard SMRT sequencing protocol is designed to generate single pass long reads. The protocol uses long insert lengths so that the polymerase can continuously synthesize along a single strand. As with all protocols, this process runs in parallel across thousands of ZMWs in a single SMRT Cell at the same time. This protocol has utility for a range of both resequencing and *de novo* applications. *Our system achieves consensus accuracy of 99.99% which is commensurate with leading second generation sequencing systems.*

- Circular consensus sequencing.  The PacBio *RS* has the capability for circular consensus The circular consensus sequencing protocol uses a circular DNA template which enables multiple reads across the same sequence to achieve 99.99% accuracy at single molecule resolution from a single DNA strand.sequencing. Furthermore, this approach provides reads  on both the forward and reverse strands of a double stranded template. This method offers potential advantages for the discovery and confirmation of rare variants.

- Strobe sequencing. The PacBio *RS* also has the capability for strobe sequencing. Using this protocol, the physical coverage and effective readlength of the system can be increased by "strobing" the illumination on and off. When the illumination is on, sequence data is collected, but when the illumination is off, the polymerase continues to synthesize in he dark at a predictable speed for thousands of bases. After a userdefined interval, the illumination can be turned back on and the system can resume collecting data. Multiple sub-reads at varying sequence advance lengths can be generated from a single molecule. The length of the strobe sub-reads and advances can be controlled dynamically as a run parameter, thereby eliminating the need to create multiple libraries of different sizes. This method will be useful for scaffolding, or mapping a series of short fragments on a longer DNA strand, genomic assembly and identifying and resolving structural variation.

- Combining sequencing modes. The system's flexibility also offers the ability to approach a problem in multiple ways. For example, users may first want to

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

scaffold the sequence using the strobe sequencing protocol, then generate long linear single molecule reads, and finally, apply circular consensus sequencing to identify rare sequence variants.

(Emphasis added).

46.    With respect to the Company's "Market Opportunities," the Offering Materials stated:

**Market Opportunity**

Despite the limitations of currently available sequencing platforms, the market for sequencing products is large and is expected to grow significantly. In 2009, the sequencing market was estimated to be $1.2 billion, which is comprised of $600 million and $600 million for first and second generation sequencing, respectively, and is expected to grow to more than $3.6 billion by 2014 according to a report commissioned on our behalf and conducted by Scientia Advisors, a life sciences consulting firm. The growth in this market is expected to be driven by increases in the demand for sequencing products from both research institutions and commercial companies, including academic institutions, reference labs and genomics service providers, pharmaceutical companies and agriculture biology, or AgBio, companies.

The primary areas of market growth are expected to be genomics, increasing from approximately $700 million in 2009 to $1.9 billion by 2014, and AgBio, increasing from approximately $200 million in 2009 to $1.3 billion by 2014. Historically, improvements in tools have driven growth in demand. We believe the emergence of third generation sequencing products, including our products, along with improvements in existing second generation products, will accelerate this growth.

There are a number of emerging markets for sequencing-based tests, including molecular diagnostics, which represent significant potential opportunities for our products. For example, the market for sequence-based molecular diagnostics is estimated to be $1.6 billion in 2014 according to Scientia Advisors.

47.    Regarding PacBio's strategy for exploiting its third generation SMRT technology, the Offering Materials stated:

**Our Strategy**

We plan to execute the following strategy:

- *Define the future of biological analysis based on SMRT technology.*   Our SMRT technology provides a window into biological processes that has not previously been available. We have and will continue to communicate the benefits and advantages of our SMRT technology platform through our commercial and marketing activities. In addition, we will continue to pursue publication of biological insights using our SMRT technology in top-tier scientific, peer-reviewed journals. We plan to continue to develop

-27-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

the applications of our SMRT technology in the field of DNA and to develop new applications in the fields of RNA and protein biology.

■ *Focus initially on the DNA sequencing market.* We will initially sell our products into the rapidly growing DNA sequencing market, addressing many of the limitations in current sequencing technologies and enabling a wide range of experiments and applications. We believe that the introduction of the PacBio *RS* will expand the market for genetic analysis tools. Customers that have placed orders for our products include research institutions and commercial companies that plan to use the PacBio *RS* for clinical, basic and agricultural research, drug discovery and development, biosecurity and bio-fuels. Our customers are also interested in a number of other potential applications, including molecular diagnostics, food safety and forensics, which may require us to enhance the capabilities of our current products or develop additional products.

■ *Continually enhance product performance to increase market share.* **The design of the PacBio RS will allow for significant performance improvements without an upgrade or replacement of the instrument hardware. These performance enhancements will be delivered through software upgrades and new consumables. Our flexible platform is designed to generate a recurring revenue stream through the sale of proprietary SMRT Cells and reagent kits. Our research and development efforts are focused on product enhancements to reduce DNA sequencing cost and time as well as expand capabilities.**

■ *Leverage platform to develop and launch additional applications.* We plan to leverage our SMRT technology platform to develop new applications targeting kinetic detection, RNA transcription monitoring, RNA sequencing, protein translation and ligand binding, which is the biochemical interaction of a molecule with a second molecule or set of molecules. We believe these applications will create substantial new markets for our technology.

■ *Create a global community of users to enhance informatics capabilities and drive adoption of our products.* We have worked closely with members of the informatics community to develop and define standards for working with single molecule, real-time sequence data. We have launched the PacBio DevNet, a software developer's open network to support academic informatics developers, life scientists and independent software vendors interested in creating tools to work with our third generation sequencing data.

(Emphasis added).

48.     With respect to the potential for future commercial applications, the Offering Materials stated:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

**Future Commercial Applications**

We believe that the power of SMRT detection extends beyond DNA sequencing to the detection and characterization of other fundamental biological functions. The ability of the SMRT technology to observe kinetic information of individual molecules provides the ability to detect nucleic acid variations, including detection of base modifications and the detection of binding of biomolecules to DNA. SMRT detection has been applied by researchers to directly observe, on a single molecule basis, transcription, reverse transcription, translation and ligand binding. Although these applications will not be available at the commercial launch of the PacBio *RS*, we plan to further develop them and, if successful, we may commercially introduce them in the future.

***SMRT Kinetic Detection.*** SMRT analysis enables the observation of the kinetics of DNA and RNA synthesis. Kinetic analysis may permit detection of base modifications in DNA and RNA beyond simple methylation. These modifications, which are hypothesized to play an important role in diseases such as cancer, have not been systematically studied due to a lack of efficient tools. The analysis of synthesis kinetics is not limited to studies of molecular structure, but is also applicable to the detection of inter-molecular interactions, for example, detecting kinetic impacts of protein-DNA interactions. Both of these applications of the SMRT platform may have important applications in disease characterization, diagnosis and treatment.

***SMRT Transcription.*** By replacing the DNA polymerase with an RNA polymerase, SMRT detection provides the ability to directly observe in real time the regulation of transcription of a gene into an RNA message, the first phase of protein expression. The combined power of direct observation of transcription and the sequence context that SMRT sequencing provides has the potential to replace present transcription assays and enable transcription analysis on a whole genome scale. It is possible that this process plays a role in diseases, such as cancer.

***SMRT RNA Sequencing.*** By replacing the DNA polymerase with a reverse transcriptase in the ZMW, SMRT detection provides the ability to directly sequence RNA and observe kinetic data similar to that seen with DNA sequencing. Directly sequencing RNA may provide advantages over traditional methods including speed, longer readlengths and reduced errors into the determined sequence.

***SMRT Translation.*** We have demonstrated the ability to observe protein translation in real time at the single molecule level by placing the ribosomal complex into the ZMW and attaching fluorescent tags to the molecules that escort the amino acids to the ribosome for protein production. It is understood that the levels of mRNA do not always correlate with the amounts of the corresponding proteins, due in part to RNA regulatory mechanisms such as miRNA binding. For this reason it is desirable to measure the levels of the many proteins as synthesized by the ribosome. As proteins represent an important target for therapeutics, understanding the dynamics of protein synthesis may be important for future drug discoveries.

***SMRT Ligand Binding.***   The interaction between ligands, including drugs and their respective biological targets, referred to as ligand binding, is an important facet of basic science. Most current ligand binding analysis techniques detect average interactions over large populations of molecules and do not detect changes in the interactions in real time. This results in an inability to detect weak interactions, or detect multi-body interactions where individual components can be interacting on a transient basis. Because it detects individual molecular interactions, we believe the SMRT detection system can probe binding interactions that are far weaker than those detected by other techniques. Further, because of its real-time observation, it can detect binding events lasting only a few milliseconds. Given the importance of ligand binding to the drug discovery process and other potential commercial applications, this new application may offer significant advantages over traditional methods.

49.    Regarding the Company's customer base, the Offering Materials stated:

**Customers**

We are targeting customers that include genome centers, clinical, government and academic institutions, genomics service providers and agricultural companies. In general, our customers will isolate, prepare and analyze genetic samples using the PacBio *RS* in their own research labs to address their specific applications and scientific questions. For example, customers in academic research institutions may have DNA samples isolated from human cancer patients while AgBio companies may have DNA samples isolated from different strains of corn or other crops.

We instituted a limited production release program pursuant to which we received orders for eleven limited production release instruments from entities such as genome centers, clinical, government and academic institutions and agricultural companies. This program was designed to help us garner quality feedback on the product prior to our full commercial launch scheduled for early 2011. We received orders for our limited production release instrument from Baylor College of Medicine, the Broad Institute of MIT and Harvard, Cold Spring Harbor Laboratory, the U.S. Department of Energy Joint Genome Institute, The Genome Center at Washington University, Monsanto Company, the National Cancer Institute/SAIC-Frederick, the National Center for Genome Resources, the Ontario Institute for Cancer Research, Stanford University and Wellcome Trust Sanger Institute. As of September 15, 2010, we have shipped a total of seven PacBio *RS* limited production release instruments, and we intend to ship the remaining four later this year. Limited production release instruments are designed to provide early access to the technology, while we complete the research, development and testing required for full commercial release. Therefore, performance during the limited production release phase will not be equal to that of the system at commercial release. There will be a continuous evolution of these performance variables, including readlength and throughput, during the limited production release phase as we develop new versions of our software and consumables. During a testing period, which we expect to last at least through the end of 2010, we will be working with these customers to obtain feedback and plan to incorporate relevant improvements into the commercial release version of the PacBio *RS*. Generally, each customer is obligated to pay us a deposit after accepting a limited production release instrument, and is entitled to receive

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

an upgrade to a commercial release version of the PacBio *RS*, at which time each customer will be obligated to pay the balance of their order and we will then recognize revenue. While we expect to deliver upgrades to all of these customers, we cannot provide assurance that we will succeed and recognize revenue from our limited production release customers.

**Backlog**

As of June 30, 2010, our backlog was approximately $15 million. We define backlog as purchase orders or signed contracts from our customers which we believe are firm and for which we have not yet recognized revenue. We expect to deliver all orders in our backlog by December 31, 2011, however we do not expect to recognize revenue on any orders prior to December 31, 2010 as we expect to commence deliveries of revenue generating commercial release PacBio *RS* instruments during early 2011. Limited production release customers are entitled to receive an upgrade to the commercial release PacBio *RS* pursuant to the terms of the sales agreements, and as a result we will not recognize instrument revenue from these customers until we fulfill our upgrade obligation and those units satisfy applicable acceptance criteria. Estimating the dollar value of backlog requires significant judgments and estimates. We may never ship these units or receive revenue from these orders, and our backlog may not be indicative of our future revenue. If our orders in backlog do not result in sales, our operating results will suffer.

50.     Finally, regarding Gen-Probe Incorporated ("Gen-Probe"), the Offering Materials set forth that it owned 6,553,080 shares of PacBio Series F convertible preferred stock at an aggregate purchase price of $50,000,000. The Offering Materials further set forth that prior to and after the IPO, Gen-Probe owned 3,276,540 PacBio shares (8.57% and 6.3% of PacBio outstanding shares, respectively). Further, the Offering Materials stated:

In June 2010, we entered into a collaboration agreement with Gen-Probe Incorporated, or Gen-Probe, a holder of more than 5% of our convertible preferred stock, regarding the research and development of instruments integrating our SMRT technologies and Gen-Probe's sample preparation technologies for use in clinical diagnostics. Subject to customary termination rights, the initial term of the collaboration will end on the earlier of (i) December 15, 2012 and (ii) six months after we achieve certain development milestones. During the collaboration period, each party will be free to sell instrument systems that incorporate its own technology but, subject to limited exceptions, neither party may jointly develop integrated sequencing systems for clinical diagnostics with any third party nor license its technology to any third party for such use. In addition, the collaboration agreement provides each party with preferred access to certain products of the other party when commercially available, both during and after the collaboration period. We are not currently able to estimate the dollar amount involved in potential transactions with Gen-Probe as the collaboration pertains to future products and applications that have not been developed.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

51.     The Offering Materials contained untrue statements of material fact and/or omitted material facts, including the following: (1) that PacBio's human gene sequencing technology in fact did not have a 99.99% accuracy rate; (2) that the PacBio *RS* system would require upgrades and/or replacement of instrument hardware; (3) that there were no plans to further develop applications for the PacBio *RS* system, as these applications could not be introduced commercially; (4) that the initial "limited production release program" was in fact a "beta test program;" (5) that the PacBio *RS* system had a significant number of "bugs" that would affect the system's performance; (6) that the PacBio *RS* system's performance envelope needed to be validated; (7) that the RS's systems were unstable and needed to be incrementally increased; (8) that the Company would experience "variability;" (9) that the accuracy rate was critical to the Company's customers; (10) that there were in fact "trade offs" involving the Company's products, such as running the equipment in either "read length" or "accuracy" mode; and (11) that the $50 million pre-IPO investment by Gen-Probe was in actuality a down payment for a system that would allow Gen-Probe to obtain a 50% discount.

52.     On November 30, 2010, PacBio released financial results for the third quarter of 2010. Following the earnings release, defendants held a conference call with analysts and investors. Defendant Martin explained that the Company was "currently in the process of updating a number of the beta sites to [its] next release," with the "upgrade" including "new software features, bugfixes, and a new enzyme chemistry." Defendant Martin also explained that "[a]t the sites that have received those upgrades, we have seen nice progress with increased readlength and accuracy." Further, Defendant Martin stated that "every single day I get a report early in the morning that gives me not only the actual statistics for how the machines [in the limited production trial] are running in terms of performance metrics, but I also get some qualitative data on how it's going," lauding "the progress [PacBio had] made from July through now" based on that feedback. With respect to price concessions, Defendant Barnes stated that for those participating in the limited production trial, the Company would "bill and [was] entitled to collect 50% of the selling price of the *RS* instruments upon customer acceptance of the beta units." When questioned by a JPMorgan analyst as to how the "upgrades" would increase accuracy, Defendant Turner responded that "full commercial release chemistry [was] expected to maintain the 99.99 and higher consensus accuracy," noting only that "the expected raw read accuracy

-32-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1  [would] be between 85% and 90%." Defendant Turner explained that if PacBio continued using "the

2  present engineering methods," PacBio saw "a pathway for [the Company] to get to 95% raw read

3  accuracy," but that it would "need to switch to new method, say for example in the area of protein

4  engineering in order to realize the gains that are physically possible beyond 90%."

5       53.    During a conference call held on April 27, 2011, Defendant Martin stated that the

6  accuracy rate of the *RS* system stood at "between 85% and 86%."

7       54.    On August 4, 2011, the Company issued a press release entitled "Pacific Biosciences of

8  California, Inc. Announces Second Quarter Financial Results." Therein, the Company revealed:

9  > During the second quarter of 2011, the Company began recognizing revenue from the
> initial commercial deliveries of its third generation sequencing platform, the PacBio RS.
10 > ***Revenue for the second quarter of 2011 totaled $10.6 million, reflecting the delivery of 16
> commercial PacBio RS instruments to customers***, initial revenue from commercial shipments
11 > of the Company's SMRT cell and reagent consumables, as well as revenue derived from
> instrument service contracts. [Emphasis added.]
12

13      55.    During the conference call held later that day, Defendant Martin admitted that the *RS*

14 system's technology had limitations, stating that "single path to accuracy will increase from 85% to

15 87%." He further stated that "now with these new very long reads users can decide how much single

16 molecule accuracy they need based on their selected insert size. They can choose anywhere from 87%

17 accuracy on 2,500 to 10,000 bases, or up to 99% raw read accuracy on a 500 base insert."

18      56.    On August 5, 2011, PacBio shares closed at $6.50 per share. The following trading day,

19 August 8, 2011, PacBio shares fell again, closing at $5.60 per share.

20      57.    On September 20, 2011, the Company announced that it would reduce its workforce by

21 28%, amounting to 130 employees. These reductions would most affect the Company's operations

22 and research and development functions. The Company stated that its current infrastructure "was

23 staffed to support a faster adoption rate for its products," and that it "had higher expectations as to the

24 rate with which adoption" of the *RS* System would occur. The following day, PacBio shares closed at

25 $4.25 per share, and closed at $3.82 per share on September 23, 2011. The Company's stock price has

26 never recovered to any level approaching the IPO price. Recently, PacBio stock has traded at

27 approximately $3.70 per share.

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

## COUNT I

### (Violation of §11 of the Securities Act Against All Defendants)

58.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Subclass. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement(s) (i.e. the "Offering Materials" as also defined herein).

59.     This cause of action is asserted by Plaintiffs against all defendants by, and on behalf of, the Subclass of all persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement(s) issued in connection with the Company's IPO.

60.     Defendant PacBio is the issuer of the securities purchased by Plaintiff Powell and the Subclass. As such, PacBio is strictly liable for the materially false and misleading statements contained in the Registration Statement(s) and the failure of the Registration Statement(s) to be complete and accurate. Each of the Officer Defendants and Director Defendants signed the Registration Statement(s) (either the Form S-1, Amendments No. 1 through 6, and/or the Form S-8) either personally or through an attorney-in-fact and/or caused their issuance. The Officer Defendants and Director Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement(s). They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement(s) misleading and that the Registration Statement(s) contained all facts required to be stated therein. In the exercise of reasonable care, the Officer Defendants and Director Defendants should have known of the material misstatements and omissions contained in the Registration Statement(s) and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, the Officer Defendants and the Director Defendants are liable to Plaintiff Powell and the Subclass.

61.     The Underwriter Defendants each served as underwriters in connection with the IPO. The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement(s). They had a

duty to ensure that the statements made in the Registration Statement(s) were true and accurate, and that there were no omissions of material facts that would make the Registration Statement(s) misleading and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained n the Registration Statement(s) and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. As such, the Underwriter Defendants are liable to Plaintiff Powell and the Subclass.

62.     The Registration Statement(s) were issued in connection with an IPO and thus there is no "safe harbor" protection for any purportedly forward looking statements.

63.     This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement(s) and within three years of the effective date of the Registration Statement(s).

64.     Plaintiff Powell acquired PacBio common stock in reliance on the Registration Statement(s) (including the Prospectus), and Plaintiff Powell did not have knowledge of the untruths and/or omissions alleged herein. Plaintiff Powell and the Subclass sustained damages and the price of PacBio shares declined in value due to the material misstatements in these Offering Materials.

65.     By virtue of the foregoing, Plaintiff Powell and the other members of the Subclass are entitled to damages from the defendants and each of them, jointly and severally.

## COUNT II

### (Violation of §12(a)(2) of the Securities Act Against the Company, the Officer Defendants and the Underwriter Defendants)

66.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiffs or members of the Subclass. This count is predicated upon defendants' strict liability for making false and materially misleading statements and omissions in the Prospectus and Registration Statement(s) (i.e. the "Offering Materials") and for making false and materially misleading oral statements in connection with the issuance of the Offering Materials, including during the roadshow for the IPO.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

67.     The Company, the Officer Defendants and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials. The Company, the Officer Defendants and the Underwriter Defendants issued or caused to be issued the Offering Materials in connection with the IPO. The Offering Materials were used to induce investors, such as Plaintiff Powell and the other members of the Subclass, to purchase PacBio securities.

68.     The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The actions of the Company, the Officer Defendants and the Underwriter Defendants included soliciting Plaintiff Powell and the Subclass by means of these defendants' participation in the preparation of the false and misleading Offering Materials. As alleged herein, the Offering Materials contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

69.     The Company, the Officer Defendants and the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there were no material omissions of facts required to be stated therein in order to make the statements contained therein not misleading. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

70.     Plaintiff Powell and the other members of the Subclass did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

71.     The Offering Materials were issued in connection with an IPO and thus the "safe harbor" for any purportedly forward looking statements, is inapplicable.

72.     This action is brought within three years from the time that the securities upon which this cause of action is brought were sold to the public, and within one year from the time when Plaintiff Powell discovered or reasonably could have discovered the facts upon which this cause of action is based.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

## COUNT III

### (Violation of §15 of the Securities Act
### Against the Officer Defendants and Director Defendants)

73.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff Powell or members of the Subclass. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Offering Materials.

74.     The Officer Defendants and the Director Defendants, by virtue of their positions and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of PacBio within the meaning of §15 of the Securities Act. The Officer Defendants and Director Defendants had the power and influence and exercised the same to cause PacBio to engage in the acts described herein.

75.     By virtue of the conduct alleged herein, the Officer Defendants and Director Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff Powell and the Subclass for damages suffered.

## VI.     SUBSTANTIVE EXCHANGE ACT ALLEGATIONS

76.     Plaintiffs repeat and reallege each and every allegation set forth above by reference as though fully set forth herein except for paragraphs 58 to 75 above.

77.     The Company and the Officer Defendants – namely, Defendants Martin, Barnes, and Dow – are named herein as defendants for Plaintiffs' Exchange Act claims.  Because of their positions within the Company, the Officer Defendants possessed the power and authority to control the contents of PacBio's reports with the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Officer Defendants also controlled the day-to-day operations of the Company.  Each of the Officer Defendants was provided with copies of the Company's reports alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, non-public information available to them,

1   each of the Officer Defendants knew, or recklessly disregarded that the statements set forth below

2   concerning the Company's technology and product, the PacBio *RS*, as well as statements concerning

3   the business prospects of the Company were, when made, materially false and misleading.   The

4   Officer Defendants are liable for the false statements pleaded herein, as those statements were each

5   "group-published" information, the result of the collective actions of the Officer Defendants.

6        78.      PacBio filed a periodic report for the quarter ending September 30, 2010, with the SEC

7   on a Form 10-Q dated November 30, 2010.  The Form 10-Q stated in relevant part:

8        *Limited Production Release Program and Backlog*

9        We instituted a limited production release program pursuant to which we
         received orders for eleven limited production release instruments from entities
10       such as genome centers, clinical, government and academic institutions and
         agricultural companies. This program was designed to help us garner quality
11       feedback on the product prior to our full commercial launch scheduled for the
         first half 2011. We received orders for our limited production release instrument
12       from Baylor College of Medicine, the Broad Institute of MIT and Harvard
         University, Cold Spring Harbor Laboratory, the U.S. Department of Energy Joint
13       Genome Institute, The Genome Center at Washington University, Monsanto
         Company, the National Cancer Institute/SAIC-Frederick, the National Center for
14       Genome Resources, the Ontario Institute for Cancer Research, Stanford
         University and Wellcome Trust Sanger Institute. *As of November 15, 2010, we*
15       *had shipped a total of eleven PacBio RS limited production release*
         *instruments.* Limited production release instruments are designed to provide
16       early access to the technology, while we complete the research, development and
         testing required for full commercial release. Therefore, performance during the
17       limited production release phase will not be equal to that of the system at
         commercial release. There will be a continuous evolution of these performance
18       variables, including readlength and throughput, during the limited production
         release phase as we develop new versions of our software and consumables.
19       During a testing period, which we expect to last at least through the end of 2010,
         we will be working with these customers to obtain feedback and plan to
20       incorporate relevant improvements into the commercial release version of the
         PacBio *RS*. Generally, each customer is obligated to pay us a deposit after
21       accepting a limited production release instrument, and is entitled to receive an
         upgrade to a commercial release version of the PacBio *RS*, at which time each
22       customer will be obligated to pay the balance of their order and we will then
         recognize revenue. While we expect to deliver upgrades to all of these customers,
23       we cannot provide assurance that we will succeed and recognize revenue from
         our limited production release customers.
24

25

26

27   (Emphasis added).

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

79.     The Form 10-Q made no mention of the discrepancy in the single molecule raw read accuracy figures.  The omission of this information made the statements in the Form 10-Q about the status of the limited production release program, which was critical to the Company's future success, materially false and misleading.

80.     The Form 10-Q was signed by Defendants Barnes and Dow.  The accompanying CEO certifications under Sections 302 and 906 of the Sarbanes-Oxley Act ("SOX") were signed by Defendant Martin.  The CFO certifications under Sections 302 and 906 of SOX were signed by Defendant Barnes.

81.     The Company held an earnings conference call on November 30, 2010, after the press release was issued.  During the call, Defendant Martin said the PacBio *RS* was undergoing a "beta test program" that was "designed to give feedback . . . on the hardware, software, consumables, training guides, and serviceability."  He claimed that typically "two to three systems" were placed with early adopters and knowledgeable customers to obtain feedback, "but given the tremendous interest in our product we have decided to support 11 beta sites and in addition charge full less price [sic] for those systems."  This was a new revelation, in that nowhere in the Prospectus was the word "beta" or the phrase "beta test program" used.

82.     The failure to describe the initial "limited production release program" as a "beta test program" in the Prospectus was a failure to disclose information necessary to make the statements therein about the limited production release program and the backlog not materially false and misleading.

83.     Defendant Martin went on to say that the typical beta test program lasts from nine to 12 months, but the Company's objective was to complete the cycle in six to nine months.  "The way we structured is that we have delivered systems with an initial beta performance envelope and then committed to upgrade those customers over the beta period to the final, fully released performance specs."  Again, this is not what the Prospectus said.  It stated "[g]enerally, each of these customers is ***obligated to pay us a deposit after accepting a limited production release instrument***, and is entitled to receive ***an upgrade to a commercial release version*** of the PacBio *RS,* at which time each customer

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

1   will be obligated to pay the balance of their order and we will then recognize revenue." (Emphasis

2   added).

3         84.    Defendant Martin continued that "[o]ur *expectation* is that *in the beginning we would*

4   *have lots of bugs, learn a tremendous amount about installation issues, and be able to validate the*

5   *initial beta performance envelope.* Over time the systems would become more stable and we would

6   then start to incrementally increase the performance with consumables and software upgrades."

7   (Emphasis added).   Again, nowhere in the Prospectus did the Company mention that it expected to

8   "have lots of bugs" with the PacBio *RS*, that the "performance envelope" needed to be validated, or

9   that systems were unstable and needed to be incrementally increased.  The Prospectus spoke instead of

10  commercializing the Company's products and its "ability to develop products that displace or

11  supplement current technology."

12        85.    The failure to state in the Prospectus that the Company expected to "have lots of bugs"

13  with the PacBio *RS*, that the "performance envelope" needed to be validated, and that systems were

14  unstable and needed to be incrementally increased demonstrated that the statements describing the

15  PacBio *RS* in the prospectus materially false and misleading.

16        86.    Defendant Martin then discussed the beta results.  He said that as of November 30, "we

17  have shipped 11 systems, of those 10 have been installed and eight have signed on acceptance. *The*

18  *initial beta specs* were 500 to 550 bases of average readlength. 99.99% or Q40 consensus accuracy

19  and *80% to 85% single molecule raw read accuracy.*" (Emphasis added).  These specifications were

20  disclosed for the first time.  He added that "the data from the beta sites is averaging about 542 basis of

21  readlength with 5% of those reads by the way from 1,374 bases or above. Consensus accuracy have

22  been ranging from 99.99% to 100% and *our average of single molecule raw read accuracy is around*

23  *84%.*" (Emphasis added).  Thus, the results were consistent with what Defendant Martin claimed was

24  expected, but not what had been previously disclosed to investors regarding the status of the PacBio

25  *RS*.

26        87.    Defendant Martin went on to say "[w]e're currently in the process of upgrading a

27  number of the beta sites to our next release. This upgrade includes new software features, *bug fixes*,

28  and a new enzyme chemistry. At the sites that have received those upgrades, we have seen nice

-40-

1  progress with *increased readlength and accuracy.*" (Emphasis added).

2      88.    Defendant Martin subsequently implicitly admitted during the conference call that

3  material information was withheld from investors in the Prospectus.  He said, in response to a

4  question, "every single day I get a report early in the morning that gives me not only the actual

5  statistics for how the machines are running in terms of performance metrics, but I also get some

6  qualitative data on how it's going. . . . I'd say probably the biggest issue that we have had *and I think*

7  *it's getting better* is what I would generally call it variability . . . . You're going to have issues like this,

8  but *I'm very pleased with the progress we've made from July through now.*"

9      89.    The failure to disclose in the Prospectus that the Company would experience

10  "variability" was materially false and misleading, as was the 80% to 85% single molecule raw read

11  accuracy in the initial beta specifications.

12      90.    Defendant Martin's statements were inconsistent with what had been previously

13  disclosed to investors regarding the status of the PacBio *RS* in the Prospectus.  They demonstrate that

14  the claims in the Prospectus about the developmental status and capabilities of the PacBio *RS* were

15  materially false and misleading, particularly the statement in the Prospectus that "[t]he circular

16  consensus sequencing protocol uses a circular DNA template which enables multiple reads across the

17  same sequence to achieve 99.99% accuracy at single molecule resolution from a single DNA strand."

18      91.    A JP Morgan analyst mentioned the "mid 80s raw read accuracy" and asked "how we

19  should be thinking about that in the context of some of the improvements that you've talked about going

20  forward and then how you can look to improve . . . longer term."  Stephen Turner ("Turner"), the

21  Company's founder and Chief Technology Officer, answered that the "full commercial release chemistry is

22  expected to maintain the 99.99 and higher consensus accuracy," but "the expected *raw read accuracy*

23  *will be between 85% and 90%* (emphasis added)."  Turner said using "the present engineering methods"

24  presented "a pathway for us to get to 95% raw read accuracy. Beyond that, we would need to switch to [a]

25  new method, say for example in the area of protein engineering . . . ." (Emphasis added).

26      92.    The JPMorgan analyst then inquired about "yield improvements going forward,"

27  specifically how the Company expected to improve on its "30% yields on the beta system on the

28  SMRT cells" to the 90% level it had mentioned, according to Turner, to "some of you about already."

-41-
AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

93.     Turner admitted that:

to move beyond this limit, we're developing what we call a Super Poisson technology. And the way that it works is we provide in each one of those Zero Mode Waveguide wells a unique mounting point that can to "move beyond this limit, we're developing what we call a Super Poisson technology [to] provide in each one of those Zero Mode Waveguide wells a unique mounting point that can accommodate one and only one polymerase. And we've already gotten good proof of principle on demonstrating this mounting point and its ability to uniquely allow just one polymerase *and, of course, development continues in combining that with the sequencing technologies*.

(Emphasis added).

94.     The admission that additional technology was necessary was needed to improve accuracy demonstrates the claims in the Prospectus as to 99.99% accuracy were materially false and misleading.

95.     In an article published on December 14, 2010, *Nature* took notice of the limitations of the PacBio *RS* technology, particularly when compared to its competitors.[2]   The article stated "Life Technologies . . . announced today that it has begun to ship orders of its Ion Personal Genome Machine (PGM) sequencers, which sell for US$49,500 each — a price that is affordable to many labs." It noted "[t]he Ion PGM . . . is the first of a new wave of sequencing machines to hit the market. Most current sequencing technologies label nucleotides with dyes, which must then be optically read as sequences, but the Ion PGM functions by directly detecting electrical signals on a disposable chip costing $250." The article compared the PGM sequencer favorably against the "[s]equencers from Pacific Biosciences, for example, [which] won't be priced for individual labs, but the technology can read 500 base chunks of DNA at a time — a capability important in deciphering certain areas of a genome — compared with the Ion PGM's 100. *However, at an investor meeting last month, Pacific Biosciences noted that its machines were so far performing at an accuracy of just 80–85%, whereas Ion Torrent says that its machines can achieve 99% accuracy*."

96.     On January 11, 2011, Turner gave a presentation at the annual J.P. Morgan

---

[2] Alla Katsnelson, DNA sequencing for the masses, *Nature* (Dec. 14, 2010), available at: http://www.nature.com/news/2010/101214/full/news.2010.674.html.

00071898.000.docx

Healthcare Conference. He noted there had been "discussion" as to the meaning and importance of "raw read accuracy." He confirmed that the PacBio *RS*'s "accuracy was 81 to 84%." He also noted "there is something called fold coverage, which is how many times you actually have to sequence the genome," and claimed "we did that only 12 times and we were able to tell what the genome was compared to other competitors who are typically up in the range of 30 to 45 times."

97.    The Company held an earnings call on February 15, 2011, to discuss its results for the fourth quarter of 2010. Defendant Martin summarized the recently held Advances in Genome Biology and Technology ("AGBT") event, which he claimed was "the premier sequencing conference in the world." Both the Company and its beta customers made presentations at the conference. Martin said "PacBio summarized and presented data from the beta sites *which showed an average read-length achieved of 1,500 bases and an average raw read accuracy of 85%*" (emphasis added). He noted that "[t]he three most important products specifications are read-length, *accuracy* and throughput. And as mentioned during AGBT, *our beta sites have already achieved the specification for* read-length and *accuracy*" (emphasis added).

98.    The statement that "our beta sites have already achieved the specification for . . . accuracy" was materially false and misleading.

99.    In response to a question from an analyst at Deutsche Bank about feedback from the beta sites, Defendant Martin said:

> *I know there has been this whole huge controversy, I will call it around raw read accuracy* and that topic didn't even come up once at the Bioinformatics Conference because people, these are people that are highly knowledgeable, understand the issues and were just thrilled quite frankly with what they were being able to see with read lengths. So I'd say that my net take on AGBT was, what a great job our customers did of accurately representing both where the state of the system is today and what they think they are going to be able to do with it.

(Emphasis added).

00071898.000.docx

100.     The failure to acknowledge the importance of "accuracy" to PacBio's customers was materially false and misleading.

101.     Defendant Martin acknowledged another problem with the beta results.   In response to a question from a JP Morgan analyst about the "strobe" that came out of the AGBT conference, he said:

> So just as background for those who may not be familiar, ***one of the effects that actually terminates or limits our read length***, and I'd say limits recognizing that it's on average 1,500 bases today, is an effect called photodamage where laser illumination can over time cause the enzymes to die off.
>
> So one way that we can dramatically increase the read length, effective read length is to image say for 500 bases with the lasers on, turn the lasers off, the enzyme continues to run, so we get a blank period where we get no read, but it's the same molecule, then we turn the lasers back on and we can turn them off and turn them on, we call that strobing. And what it does is it gives you islands of sequence that you know are connected because it's all one molecule.
>
> This is especially effective in areas where you may have very long repeats because what it does is it gives you the ability to anchor a sequence context in the middle of this very long repeat and you can do that multiple times and so it allows you to get much more complete assemblies.
>
> ***That functionality was only rolled out in the beta program to just a few of our customers on a limited basis***, it's one of the last technologies to be introduced by us in this release. ***And so the actual beta sites, the – all of the beta sites won't see strobe until they complete this upgrade cycle just because the release of software that includes strobe is bundled there***.
>
> So I don't think we have yet even begun to see the impact and use of strobe though, I can tell you the two customers that have used strobe so far are very, very enthusiastic about it. You're getting effective reads in the range of 10,000 to 12,000 bases which is – can be very, very powerful.

(Emphasis added).

102.     However, in response to questions from an analyst at Morgan Stanley, Defendant Martin said:

> So, as I – one of my barometers of how this is all going to be going is how these [beta] sites are doing and so far everything looks really good. Once those sites are upgraded, they will – obviously they have their own work that they're going to be running. ***But we also have an intensive validation and verification phase underway***, which will take several months and in that period of time what we're going to be doing is going through over 1,000 different sequencing run examples

-44-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

where we take a look at every possible corner case, running 24 SMRT cells in a row, and the power fails halfway through and et cetera, et cetera, et cetera, to try and really bang on the product.

So we're doing that – we're right now – we have FcR units completed on the manufacturing floor. We're running them for validation and verification. We have internal units in R&D that are doing that. And some of our customers will be running runs for us for this validation and verification cycle. Once that's completed, *we'll probably have some bug fixes and software mods*, and so we'll then roll a version of a software and then we'll see where we are at that point.

\* \* \*

*Accuracy is going to be a lot of work*, but we've got a number of areas that we're going after. The other thing too, *we can trade-off read lengths and accuracy just as a simplification*. A way to think about it, *we can turn up the laser power which of course is going to increase photo damage which would tend to lower your read length, but at higher laser power, the die signals are much brighter and so the accuracy goes up. So it is possible that in the future, we may offer a read length mode and an accuracy mode*. So, I'm confident.

*Our customers right now, today, we can do pretty much any re-sequencing application with the raw read accuracy at around 85% that we have*. And our customers are telling us they'd really like to see us for de novo sequencing, especially de novo mammalian, *they'd like to see if it's 90% or greater. And I am confident that with time we're absolutely going to be able to get there*.

As far as throughput, I think the best way to think about throughput is throughput is going to be directly related to read lengths. So you've got so many holes. That's going to be relatively fixed at least for a while. But as the read lengths goes up, you double the read length, you double the throughput. So I think you're going to see some attended increases in throughput as our read length goes up.

(Emphasis added).

   103. The failure to acknowledge in the Prospectus that there were "trade offs" involving the Company's products, *e.g.*, read lengths for accuracy, and the possible need to run the equipment either in a "read length" or "accuracy" mode, was materially false and misleading.

   104. An analyst from Gleacher & Co. asked "as you talk to your potential customers, what are some of the key factors holding them back, maybe, from placing an order at this point? And you know, specifically in terms of your current throughput, is that an issue that comes up in your conversations for the type of customers that you are currently targeting?" Defendant

-45-

1  Martin responded, "No, it doesn't. I think they – the biggest issue that comes up at our

2  conversation is when they can actually get the system. That by far and away, delivery time is the

3  conversation."

4      105.    The statement that "delivery time" was the key factor holding up orders was

5  materially false and misleading.

6      106.    Notwithstanding these difficult issues, Defendant Martin said "[w]e plan to start

7  commercial shipments during Q2 of this year" and "[o]ur sales organization continues to build

8  our backlog, which measured 38 systems at the end of Q4."

9      107.    Three days after the earnings call, JP Morgan noted that "[a]ccuracy also remains

10  an area of focus." It said some researchers were concerned that longer reads might result in higher error

11  rates which could reduce the overall utility of the PacBio's *RS*.

12      108.    On March 16, 2011, Oppenheimer expressed concerns that "[a]lthough the

13  system delivers on the promise of increased read length and low cost per experiment, *it has*

14  *disappointed on raw read accuracy and overall throughput"* (emphasis added).

15      109.    PacBio's stock price during this period was being maintained, according to JP

16  Morgan and Oppenheimer, by Defendant Martin's statement that the Company had a 38 system

17  backlog.

18      110.    PacBio's Form 10-K for fiscal year 2010 (the "2010 Form 10-K") was filed with

19  the SEC on March 23, 2011. The 2010 Form 10-K set out competing objectives for the

20  Company. On the one hand, part of the Company's strategy was stated as follows:

21      ***Continually enhance product performance to increase market share.*** The

22  design of the PacBio *RS* will allow for significant performance improvements without an upgrade or replacement of the instrument hardware. Our flexible platform is designed to generate a recurring revenue stream through the sale of

23  proprietary SMRT Cells and reagent kits. Our research and development efforts

24  are focused on product enhancements to reduce DNA sequencing cost and time as well as expand capabilities.

25  (Emphasis in original). On the other, the Company disclosed:

26

27  We plan to continue investment in research and development to support ***the ongoing development*** of chemistry components and protocols to enhance overall

28  system performance. ***Our goals are to continuously improve sequencing***

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

*readlength, raw read accuracy* and the number of reactions on each SMRT Cell, as well as to develop and introduce into the marketplace new applications that will take full advantage of our single molecule, real-time detection technology. *In addition, our engineering teams will continue their focus on increasing instrument component and system reliability, reducing costs, increasing sample throughput, and implementing additional system flexibility and versatility.*

(Emphasis added).   The Company did not explain how the inconsistencies in these two sections—performance improvements without an upgrade or replacement of the instrument hardware versus research and development to improve sequencing readlength and raw read accuracy—could be reconciled.

111.   Moreover, the 2010 Form 10-K did not disclose that the "*Continually enhance product performance to increase market share*" language had previously appeared in the Prospectus, or that the Prospectus contained a sentence that was omitted in the 2010 Form 10-K. The Prospectus stated:

The design of the PacBio *RS* will allow for significant performance improvements without an upgrade or replacement of the instrument hardware. *These performance enhancements will be delivered through software upgrades and new consumables.* Our flexible platform is designed to generate a recurring revenue stream through the sale of proprietary SMRT Cells and reagent kits. Our research and development efforts are focused on product enhancements to reduce DNA sequencing cost and time as well as expand capabilities.

(Emphasis added).   The omission of the sentence "These performance enhancements will be delivered through software upgrades and new consumables" from the 2010 Form 10-K could only mean that such enhancements *could not* be accomplished through "software upgrades and new consumables;" rather, they would have to be accomplished through changes to the hardware itself.

112.   As such, the statement in the Prospectus that "performance enhancements will be delivered through software upgrades and new consumables" was materially false and misleading.

113.   The Company held an earnings call on April 27, 2011 to discuss its results for the first quarter of 2011.   During the call, Defendant Martin announced the commercial launch of the PacBio *RS*.   He said that two commercial systems had been shipped and were being

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

installed, and the beta sites would be upgraded with final release software later in the quarter. According to Martin, "[t]his last upgrade was the most complex of the entire beta program as the increase in throughput exercise the full capability of our optic systems, our imaging system and our real-time data pipeline. Read-length and accuracy are approximately the same as we reported in February despite the huge throughput increase as the chemistry has not changed significantly." While "[r]ead-length is consistently above our targeted specification of 1,000 basis on average   . . . *accuracy is between 85% and 86%*" (emphasis added). In response to a question from an analyst from Morgan Stanley, Martin admitted the new "base-calling software" would not improve accuracy beyond 86% to 88%.

114.    Also during the call, Ben Gong ("Gong"), from Investor Relations, said the Company had "begun to ship commercial products and therefore we anticipate recording revenue for our products starting this quarter." He also said the Company expected to record approximately $35 million in revenue for the entire year of 2011.  According to Gong, as of March 31, 2011, the Company's backlog "was approximately $28 million, up from approximately $24 million at the end of the previous quarter. This increase of $4 million reflects six additional systems added to our backlog bringing the total to 44 systems. We expect to install and recognize revenue on these systems by the end of the year." Defendant Dow noted that "Under the terms of our beta program, we bill and collect 50% of the selling price of the *RS* instrument upon the customer's acceptance of the beta unit. All amounts billed under this program have been collected. We will bill the remaining 50% of the customer balance and recognize revenue from the instrument once the beta instrument is upgraded to commercial specifications, and we have verified that it is performing as expected."

115.    Defendant Martin refused to respond to a question from the Morgan Stanley analyst as to how much of the projected $35 million in revenue was expected to come from consumables other than to say "the large majority of the revenues are going to come from the instrument or system revenues."

-48-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

116.    On April 19, 2011, GenomeWeb stated that "[i]nvestment house William Blair on Monday initiated coverage of Pacific Biosciences and Complete Genomics."[3]    Analyst Amanda Murphy estimated revenue for the second quarter at $5.9 million.  Loss per share for the first quarter on a generally accepted accounting principles ("GAAP") basis was estimated at $0.62, or $0.55 on an adjusted basis, while loss per share in the second quarter was estimated at $0.53 on a GAAP basis, or $0.46 on a non-GAAP basis.  For full-year 2011, she estimated revenues at $31.7 million, with a GAAP loss per share of $2.41, or $2.12 on a non-GAAP basis.  However, she cautioned that the PacBio's *RS* would only be used initially by researchers for niche applications, and "the pace of its longer-term adoption is somewhat uncertain and dependent on the validation of incremental research applications and ***the company's ability to improve specifications over time***" (emphasis added).  This would be dependent upon "successful rollout of system specifications —such as the introduction of software functionality that will allow for easier analysis of kinetic properties, as well as improvements to throughput — and continued expansion into research and clinical applications."  Overall, Murphy estimated PacBio would ship 46 machines in 2011, 125 in 2012, and 170 in 2013.

117.    Another report released on April 14, 2011, found that "PacBio *RS* fits a clear niche, ***although technical hurdles remain***," particularly with respect to "raw read accuracy, throughput, and instrument footprint."

118.    On May 13, 2011, an article entitled "Pacific Biosciences Has a PR Problem" appeared in The Motley Fool.[4]    The article attempted to put PacBio's status in perspective, stating:

> Pacific Biosciences of California . . . has gotten a lot of lift from its own sound bites, too: It gained a great deal of notoriety a few years back by claiming it would be able to produce a complete, high-quality human genome in 15 minutes by 2013, for a cost of only around $1,000. These claims -- backed by some truly virtuoso science -- helped the company land $370 million in <u>venture capital</u> and another $200 million from its October 2010 IPO.

---

[3] Available at: http://www.genomeweb.com/sequencing/william-blair-initiates-coverage-pacbio-complete-genomics.
[4] Available at: http://www.fool.com/investing/high-growth/2011/05/13/pacific-biosciences-has-a-pr-problem.aspx.

00071898.003.docx

But in April, PacBio made the transition from a company selling a great scientific story to one selling real machines. ***And the reality is that the 15-minute genome, much less the $1,000 price tag, is still a long way off.*** Concepts the gene jocks once drooled over are now, in some corners, getting rounded off to "hype." As a recent *Businessweek* article put it, ***"The consensus view among rivals and some outsiders is that the company is unrealistic about its commercial prospects."***

(Emphasis added).  The article went on to quote Defendant Martin, who said:

> ***How do you raise $370 million as a private company? You raise $370 million saying, "I want to show you where we can go." So that's what we did.***
>
> \*       \*       \*
>
> We know how to do this. ***But we had to get to market quickly. And so once you have something to sell, the last thing in the world you want to be doing is waving your arms about [what the company can eventually achieve]; you want to be waving your arms about what you're selling.***

(Emphasis added).

119.    The article stated "[t]hat change of focus and some early stats on the machine -- notably its relatively low 85% single-pass accuracy rate versus a similarly priced HiSeq machine from Illumina . . . -- has given doubters a lot of ammunition."  It went on to say:

> [Defendant] Martin argues -- pretty convincingly in my opinion -- that the 85% accuracy number is a red herring. That's because, he says, sources of error in the system are entirely nonsystemic. In other words, sequencing errors show up in random places and are highly unlikely to appear in the same place on a second pass, meaning <u>multiple</u> passes (that is, more coverage) will quickly arrive at an extremely accurate result. And the machine is so fast that multiple passes (which are standard practice in all gene sequencing) can be quickly accomplished. Because current pyrosequencing methods rely on things like DNA amplification, errors may be fewer but more persistent, so even multiple passes could give you the same erroneous result.
>
> That's a tough argument to make to investors – there's that PR problem again-- and perhaps even a tough argument to make with some users. But data will eventually convince PacBio's customers, even if Wall Street lags behind. Importantly, Martin notes, the company can improve its speed and cost an order of magnitude or more with the current system, through advances it is making with reagents and the disposable chips used for the system. That's an important consideration for any lab looking to plunk down $695,000 on a device it doesn't want to see become quickly obsolete.

120.    On August 4, 2011, PacBio issued a press release containing its financial results for the second quarter ending on June 30, 2011.  According to the press release, "[d]uring the second

quarter of 2011, the Company began recognizing revenue from the initial commercial deliveries of . . . the PacBio RS. Revenue for the second quarter of 2011 totaled $10.6 million, reflecting the delivery of 16 commercial PacBio *RS* instruments to customers, initial revenue from commercial shipments of the Company's SMRT cell and reagent consumables, as well as revenue derived from instrument service contracts."

121.    The Company held an earnings call on August 4 to discuss its results for the second quarter.  Defendant Barnes stated that the $10.6 million in revenue consisted of $10 million from instruments, $200,000 from consumables, and $400,000 from services and research grants.  Of the 16 commercial systems delivered, 11 were beta systems upgraded to commercial specifications and only five were new deliveries.

122.    Defendant Martin said "We announced 7 new orders, bringing our cumulative total order number to 51. I am aware that some of you are concerned about the pace of new orders and what that means for our business over the next year." He discounted the significance of this development, stating:

> Other than the industry uncertainty regarding funding, I believe there are two significant factors that have impacted our new order uptake, and while these factors may have kept bookings relatively low in the short term I do not foresee them hindering our long-term prospects. Both factors relate to the ability to show near-term value to prospective customers. First the beta systems had stability and variability issues that are typical for a beta program. This was not surprising. However, those problems prevented customers from truly assessing the RS's utility.
>
> With our commercial release in the second quarter, system stability and variability are dramatically improved and this has enabled customers to now run the system daily. Secondly our initial raw read accuracy of 85% limited some of our users to certain applications. With our upcoming C2 release, we believe this issue will be eliminated since customers will be able to obtain raw accuracies of 93% for insert sizes of 1350 bases and over 99% for insert sizes of 500 bases.

123.    Martin had no definitive answers in response to analysts' concerns about new orders. He took it as a positive sign that current customers were "running them around the clock" which could "lead people to say, you know, maybe I need another one or two or three or five." He mentioned the upcoming "C2" consumable upgrade, which "has caused a very positive increase in interest" and

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

"there may be customers out there who are saying well I'm going to wait until I can guarantee that a system arrives with a C2 chemistry or that I see more data."

124.    Defendant Martin's failure to describe the true reasons for the lack of new orders—the unreliability of the technology, its high cost, and the availability of similar products from competitors at much lower prices—made his statement materially false and misleading.

125.    Defendant Martin also admitted that the technology had certain limitations.  He said:

> The second sign of a new generation emerging is rapid improvement in the technology itself. During the second quarter, we finalized the specification of our C2 upgrade chemistry that will be shipped in the fourth quarter. Read-length will increase from the current 1,000 base pairs to an average of 2,700. In fact 5% of those reads will achieve over 5,100 bases. Throughput will double from the current 35% to 45% mega bases per SMRT Cell to 90 mega bases per SMRT Cell.
>
> **Single path to accuracy will increase from 85% to 87%**, and very importantly, two pads [ph] can circular-consensus reads (19:20) with an insert size of 1,350 bases will yield *a single molecule accuracy of over 93%*. For the first time, these performance specs will enable customers to take on the entire spectrum of sequencing projects. Most importantly the de novo sequencing of many organisms is now enabled. For a large number of projects, customers no longer will require hybrid assembly technique with other technologies in order to achieve extremely high quality results. This is a major inflection point for many prospective customers.
>
> Users are also really excited about single molecule reads. The ability to detect an individual copy of variant DNA is of course important, *but now with these new very long reads users can decided how much single molecule accuracy they need based on their selected insert size. They can choose anywhere from 87% accuracy on 2,500 to 10,000 bases, or up to 99% raw read accuracy on a 500 base insert.* Our customers can now obtain raw reads on a single molecule that are more accurate than any other platform and have longer read life.

(Emphasis added).  He added later:

> Based on what we're just now talking about, about trading of read length for accuracy, I think there are two ways to think about it. One is, how long a read length do I need to get me the accuracy that I want. So if you want 99% or greater raw read accuracy with our [ph] feature (39:44) chemistry you're going to probably have a 500 base insert size, or read length. If you want – if 93% is good enough then you can be up at 1,350 bases, and if 87% is enough you can be at 3,000 bases or 2,700 bases. So it depends on how much accuracy that you need. Or if you want read lengths, just for read length sake saying you have mapping applications, then you're going to want to just go for the longest read length. And in most cases there, the longer, the better. So but I do want to say, that I think there are certainly any number of applications you can use the full customer-release chemistry that's out right now, but the C2 chemistry now that

customers understand it, and some have actually started using it, as a trial, that chemistry is fundamentally enabling.

Thus, users of the PacBio *RS* would have to accept trade-offs to get the accuracy they desired.

126.    The next day, August 5, 2010, JP Morgan downgraded its rating of PacBio due to a significantly lower projection of orders in 2012.  It projected that PacBio would not become profitable until 2015, and it lowered its target price for PacBio shares down to $10.

127.    The press release, the conference call, and the JP Morgan report shocked the market. The press release was issued and the conference call was held after the close of trading on August 4. Shares of PacBio closed at $9.90 per share that day.  The next trading day, August 5, 2011, shares of PacBio closed at $6.50 per share, a decline of $3.40 per share, or over 34%, on trading volume that was over two times greater than the previous day's.  The next trading day, August 8, 2011, PacBio closed at $5.60 per share, a decline of an additional $0.90 per share, again on very heavy trading volume.  In two trading days, PacBio stock lost $4.30 per share, or over 43% of its value.

128.    On August 12, 2011, the Company filed its periodic report for the quarter ending June 30, 2011 with the SEC on Form 10-Q.  The Form 10-Q stated, in relevant part:

In April, we began commercial shipments of PacBio *RS* instruments and as of June 30, 2011, had recognized revenue on 16 instruments, including 11 beta instruments that were updated successfully to commercial specifications, as well as consumables revenue and service agreement revenue associated with the instruments.

*          *          *

During the second quarter of 2011, the majority of our revenue related to the sale of PacBio *RS* instruments and associated consumables and services. Service and other revenue primarily consists of product maintenance agreements, while grant revenue represents amounts earned under research agreements with government entities which are recognized in the period during which the related costs are incurred.

We anticipate that our future revenue will be generated primarily from sales of our PacBio *RS* instrument and consumables, comprised of SMRT Cells and reagent kits, and system maintenance agreements.

***As of June 30, 2011, our backlog was approximately $22 million comprised of 35 systems***. We define backlog as purchase orders or signed contracts from our customers which we believe are firm and for which we have not yet recognized revenue. ***We expect to convert this backlog to revenues by December 31, 2011.***

(Emphasis added).

-53-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

129.    The Form 10-Q was signed by Defendants Barnes and Dow.  The accompanying certifications of the CEO under Sections 302 and 906 of SOX were signed by Defendant Martin.  The CFO certifications under Sections 302 and 906 of SOX were signed by Defendant Barnes.

130.    On September 20, 2011, after the close of the market, PacBio filed a Form 8-K with the SEC in which it announced it was reducing its workforce by approximately 130 employees, or approximately 28% of its total workforce.  According to the Form 8-K:

> The actions taken were in consideration of uncertainties associated with the economic environment and to position the Company for long-term success. ***The Company's current infrastructure was staffed to support a faster adoption rate for its products.*** The reduction implemented will allow the Company to continue support of its growing customer base with improved service and continued product enhancements, while at the same time conserving cash.
>
> \*          \*          \*
>
> ***Although the cuts were across the organization, the Company's operations and research and development functions were most effected*** [sic].

(Emphasis added).

131.    Defendant Martin said the following in an email circulated to Company employees:

> Given the uncertainties associated with the economic environment and our desire to position ourselves for long-term success, we have chosen to reorganize the company. ***Our current infrastructure was staffed to support a faster adoption rate for our products***. These changes will allow us to continue to support our growing customer base with improved service and continued product enhancements, while at the same time conserving cash.
>
> \*          \*          \*
>
> PacBio is in the process of introducing a game changing, new generation of sequencing technology. Even in stable, high growth markets, adoption rates of such a disruptive platform can be difficult to predict. In today's turbulent economy, it is even more difficult. We see many of the signs that customers are recognizing the value of our third generation paradigm. However, ***we had higher expectations as to the rate with which adoption would occur. Our internal infrastructure was therefore built to handle a faster generational transition***. Consequently, our burn rate was not in line with the speed with which the business was evolving.  In addition, we are refocusing our resources as we transition from developing and launching a product to establishing the technology in the market and supporting customers as they develop applications and make novel discoveries with the PacBio *RS*.

(Emphasis added).

-54-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

132.    The Company thus admitted what was apparent to its analysts: its products were not selling at the rate it had projected.   Moreover, with the cuts to its research and development department, the prospects for needed improvement in the Company's new and still developing technology were dim.

133.    The market reacted immediately.  The Company's stock, which closed at $5.56 per share on September 20, 2011, fell $1.31 per share to close at $4.25 per share on September 21, 2011, a decline of almost 24%, on trading volume that was nearly nine times greater than the previous day's.

## VII.    UNDISCLOSED ADVERSE INFORMATION

134.    The market for PacBio's common stock was open, well-developed and efficient at all relevant times.   As a result of these materially false and misleading statements and material omissions, PacBio's common stock traded at artificially-inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased or otherwise acquired PacBio common stock upon the integrity of the market price of PacBio common stock and market information relating to PacBio, and have been damaged thereby.

135.    During the Class Period, the Company and the Officer Defendants materially misled the investing public, thereby inflating the price of PacBio common stock by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make their statements, as set forth herein, not materially false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, and its business and operations, as alleged herein.

136.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the other members of the Class.   As described herein, during the Class Period, the Company and the Officer Defendants made or caused to be made a series of materially false or misleading statements about PacBio's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1   the market an unrealistically positive assessment of PacBio and its business, prospects and

2   operations, thus causing the Company's common stock to be overvalued and artificially inflated

3   at all relevant times.

4          137.    The Company's and Officer Defendants' materially false and misleading

5   statements and material omissions during the Class Period resulted in Plaintiffs and the other

6   members of the Class purchasing the Company's common stock at artificially-inflated prices,

7   thus causing the damages complained of herein.

8   **VIII.   CAUSATION AND ECONOMIC LOSS**

9          138.    During the Class Period, as detailed herein, the Company and Officer Defendants

10  engaged in a scheme to deceive the market, and a course of conduct that artificially inflated

11  PacBio's stock price and operated as a fraud or deceit on Class Period purchasers of PacBio's

12  stock by misrepresenting the Company's future business prospects.   Ultimately, however, when

13  the truth concerning the Company's business prospects, and specifically its revenue projections,

14  were revealed, the price of PacBio common stock declined precipitously – evidence that the

15  prior artificial inflation in the price of PacBio's shares was eradicated.   As a result of their

16  purchases of PacBio stock during the Class Period, Plaintiffs and other members of the Class

17  suffered economic losses, *i.e.* damages under the federal securities laws.

18         139.    During the Class Period, the Company and the Officer Defendants reported

19  growth and earning prospects that were utterly unrealistic due to the limitations of the PacBio

20  *RS* technology and its significance to the Company's overall success.   These claims caused and

21  maintained the artificial inflation in PacBio's stock price throughout the Class Period and until

22  the truth about the Company was ultimately revealed to investors.

23         140.    The Company's and Officer Defendants' materially false and materially

24  misleading statements had the intended effect of causing PacBio's shares to trade at artificially-

25  inflated levels throughout the Class Period.

26         141.    On September 20, 2011, however, the Company and Officer Defendants revealed

27  that the Company would come nowhere near achieving revenue previously sponsored and/or

28  endorsed by Defendants. That day, PacBio and the Officer Defendants reported the Company was

00071898.000.docx

1    laying off approximately 130 employees in order to conserve cash. These belated disclosures

2    were even more shocking given that the Company and the Officer Defendants knew during the

3    entire Class Period that the PacBio *RS* was not delivering on its technological promises and

4    faced significant competition from other entities. These belated disclosures had an immediate,

5    adverse impact on the price of PacBio shares.

6         142.   These belated revelations also evidenced the prior falsification of PacBio's

7    business prospects due to the Company's and Officer Defendants' false statements. As

8    investors and the market ultimately learned, the Company's prior business prospects had been

9    overstated and its valuation overstated. As this adverse information became known to investors,

10   the prior artificial inflation began to be eliminated from PacBio's share price and Plaintiffs and

11   the other members of the Class were damaged as a result of the related share price decline.

12        143.   As a direct result of these defendants' statements on September 20, 2011,

13   PacBio's stock price fell over almost 24% in the single trading day on very heavy trading

14   volume. This dramatic share price decline eradicated much of the artificial inflation from

15   PacBio's share price, causing real economic loss to investors who purchased this stock during

16   the Class Period.

17        144.   The decline in PacBio's stock price at the end of the Class Period was a direct

18   result of the nature and extent of PacBio's and the Officer Defendants' fraud being revealed to

19   investors and to the market. The timing and magnitude of PacBio's stock price decline negates

20   any inference that the losses suffered by Plaintiffs and the other members of the Class were

21   caused by changed market conditions, macroeconomic or industry factors or even Company-

22   specific facts unrelated to PacBio's and the Officer Defendants' fraudulent conduct. On the

23   same day that PacBio's share price fell almost 24% as a result of the Company's and Officer

24   Defendants' fraud being revealed, the Standard & Poor's 500 securities index declined by less

25   than 3%.

26        145.   The economic loss, *i.e.* damages, suffered by Plaintiffs and the other members of

27   the Class, was a direct result of PacBio's and the Officer Defendants' fraudulent scheme to

28   artificially inflate the price of PacBio's stock and the subsequent significant decline in the value

-57-

00071898.000.docx

1  of the Company's shares when their prior misstatements and other fraudulent conduct was

2  revealed.

3  **IX.   SCIENTER**

4       146.   As alleged herein, the Officer Defendants acted with scienter in that each them

5  knew that the public documents and statements issued or disseminated in the name of the

6  Company were materially false and misleading; knew that such statements or documents would

7  be issued or disseminated to the investing public; and knowingly and substantially participated

8  or acquiesced in the issuance or dissemination of such statements or documents as primary

9  violations of the federal securities laws.   As set forth elsewhere herein in detail, the Officer

10 Defendants, by virtue of their receipt of information reflecting the true facts regarding the true

11 status of the technical capabilities of the PacBio *RS*, their control over and/or receipt and/or

12 modification of PacBio's allegedly materially misleading misstatements and/or their

13 associations with the Company which made them privy to confidential proprietary information

14 concerning PacBio, participated in the fraudulent scheme alleged herein.   Defendant Martin

15 made clear as early as November 30, 2010, that he was aware that critical statements in the

16 Prospectus, which had been finalized barely a month previously, were materially false and

17 misleading, when he said:

18      Our expectation is that in the beginning we would have lots of bugs, learn a
        tremendous amount about installation issues, and be able to validate the initial beta
19      performance envelope. Over time the systems would become more stable and we
        would then start to incrementally increase the performance with consumables and
20      software upgrades, and that beta testing results showed "80% to 85% single
        molecule raw read accuracy."
21

22      147.   Defendant Martin was at all relevant times the Chairman, President and CEO of

23 PacBio.  By use of such phrases as "Our expectation is that in the beginning we would have lots of

24 bugs," "we have decided to support 11 beta sites," and "we also have an intensive validation and

25 verification phase underway," it is plausible, if not likely, that he was referring to Executive

26 Vice President and CFO Barnes and Vice President and Principal Accounting Officer Dow, both of

27 whom, by virtue of their positions with the Company, were privy to confidential information

28 concerning PacBio.   The ongoing fraudulent scheme described herein could not have been

-58-

00071898.000.docx

perpetrated over the duration of the Class Period without the knowledge and participation of executives at the highest level of the Company, including the Officer Defendants.

148.     Officer Defendants Martin, Barnes, and Dow made, signed, and/or approved each of the false and misleading statements cited herein, continued during the Class Period to make false and misleading statements about the prospects and potential of the PacBio *RS* technology and the Company's backlog and revenues while knowing the Company was experiencing significant technical and other issues that made its projections unreasonable.

149.     The Company and the Officer Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the scheme: (i) allowed them to deceive the investing public regarding PacBio's business, operations, management and the intrinsic value of PacBio common stock; and (ii) caused Plaintiffs and the other members of the Class to purchase PacBio common stock at artificially-inflated prices.

X.   **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
     **FRAUD-ON-THE-MARKET DOCTRINE**

150.     At all relevant times, the market for PacBio's common stock was an efficient market for the following reasons, among others:

(a)     PacBio's stock met the requirements for listing, and was listed and actively traded on the NASDAQ national market exchange, a highly-efficient and automated market;

(b)     As a regulated issuer, PacBio filed periodic public reports with the SEC and NASDAQ;

(c)     PacBio regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting; and

-59-

00071898.000.docx

1        (d)    PacBio was followed by several securities analysts employed by major

2   brokerage firm(s) who wrote reports which were distributed to the sales force and certain

3   customers of their respective brokerage firm(s).  Each of these reports was publicly available

4   and entered the public marketplace.

5        151.    As a result of the foregoing, the market for PacBio securities promptly digested

6   current information regarding PacBio from all publicly available sources and reflected such

7   information in PacBio stock price. Under these circumstances, all purchasers of PacBio common

8   stock during the Class Period suffered similar injury through their purchase of PacBio common

9   stock at artificially-inflated prices and a presumption of reliance applies.

10  **XI.   NO STATUTORY SAFE HARBOR**

11       152.    The statutory safe harbor provided for forward-looking statements under certain

12  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

13  Many of the specific statements pleaded herein were not identified as "forward-looking

14  statements" when made.  To the extent there were any forward-looking statements, there were

15  no meaningful cautionary statements identifying important factors that could cause actual results

16  to differ materially from those in the purportedly forward-looking statements.

17       153.    Alternatively, to the extent that the statutory safe harbor does apply to any

18  forward-looking statements pleaded herein, the Company and Officer Defendants are liable for

19  those false forward-looking statements because at the time each of those forward-looking

20  statements was made, the particular speaker knew that the particular forward-looking statements

21  was false, and/or the forward-looking statement was authorized and/or approved by an executive

22  officer of PacBio who knew that those statements were false when made.

23  **COUNT IV**

24  **(Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Against the Company and the Officer Defendants)**

25       154.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

26  set forth herein except for paragraphs 58 to 75 above.

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

155.    During the Class Period, the Company and Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public regarding PacBio's business, operations, management and the intrinsic value of the Company's common stock; and (ii) cause Plaintiffs and other members of the Class to purchase PacBio common stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Company and Officer Defendants, jointly and individually (and each of them) took the actions set forth herein.

156.    The Company and Officer Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PacBio's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

157.    The Company and Officer Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of PacBio as specified herein.

158.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PacBio's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PacBio and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of PacBio common

-61-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1    stock during the Class Period.

2        159.    Each of the Officer Defendants' primary liability, and controlling person

3    liability, arises from the following facts:  (i) the Officer Defendants were high-level executives

4    and/or a director at the Company during the Class Period and members of the Company's

5    management team or had control thereof; (ii) each of these Defendants, by virtue of his or her

6    responsibilities and activities as a senior officer and/or director of the Company was privy to

7    and participated in the creation, development and reporting of the Company's internal budgets,

8    plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal

9    contact and familiarity with the other Defendants and was advised of and had access to other

10   members of the Company's management team, internal reports and other data and information

11   about the Company's product development, finances, operations, and sales at all relevant times;

12   and (iv) each of these Defendants was aware of the Company's dissemination of information to

13   the investing public which they knew or recklessly disregarded was materially false and

14   misleading.

15       160.    The Officer Defendants had actual knowledge of the misrepresentations and

16   omissions of material facts set forth herein, or acted with reckless disregard for the truth in that

17   they failed to ascertain and to disclose such facts.  Such Defendants' material misrepresentations

18   and/or omissions were done knowingly or with recklessly for the purpose and effect of

19   concealing PacBio's operating condition and future business prospects from the investing public

20   and supporting the artificially-inflated price of its common stock.  As demonstrated by the

21   Officer Defendants' overstatements and misstatements of the Company's business, operations

22   and earnings throughout the Class Period, the Officer Defendants, if they did not have actual

23   knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

24   such knowledge by recklessly refraining from taking those steps necessary to discover whether

25   those statements were false or misleading.

26       161.    As a result of the dissemination of the materially false and misleading information

27   and failure to disclose material facts, as set forth above, the market price of PacBio common

28   stock was artificially inflated during the Class Period.  In ignorance of the fact that market

-62-

00071898.000.docx

prices of PacBio's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Officer Defendants and not disclosed in public statements by PacBio or the Officer Defendants during the Class Period, Plaintiffs and the other members of the Class acquired PacBio common stock during the Class Period at artificially-high prices and were damaged thereby.

162.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that PacBio was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their PacBio common stock or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

163.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

164.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT V
### (Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants)

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for paragraphs 58 to 75 above.

166.    The Officer Defendants acted as controlling persons of PacBio within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and

-63-

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1   disseminated to the investing public, the Officer Defendants had the power to influence and

2   control and did influence and control, directly or indirectly, the decision-making of the

3   Company, including the content and dissemination of the various statements which Plaintiffs

4   contends are false and misleading. The Officer Defendants were provided with or had unlimited

5   access to copies of the Company's reports, press releases, public filings and other statements

6   alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued

7   and had the ability to prevent the issuance of the statements or cause the statements to be

8   corrected.

9       167.   In particular, each of these Officer Defendants had direct and supervisory

10  involvement in the day-to-day operations of the Company and, therefore, is presumed to have

11  had the power to control or influence the particular transactions giving rise to the securities

12  violations as alleged herein, and exercised the same.

13      168.   As set forth above, PacBio and the Officer Defendants each violated Section

14  10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of

15  their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a)

16  of the Exchange Act. As a direct and proximate result of the Officer Defendants' wrongful

17  conduct, Plaintiffs and other members of the Class suffered damages in connection with their

18  purchases of the Company's common stock during the Class Period.

19                              **PRAYER FOR RELIEF**

20      WHEREFORE, Plaintiffs, individually and on behalf of the Class, prays for judgment as

21  follows:

22      A.   Determining that the instant action may be maintained as a class action under

23  Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class

24  representatives;

25      B.   Awarding damages in favor of  Plaintiffs and the other Class and Subclass

26  members against all Defendants for all damages sustained as a result of Defendants'

27  wrongdoing, in an amount to be proven at trial, including interest thereon;

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1        C.     Ordering that Plaintiff Powell and the members of the Subclass who retain their

2    PacBio common stock purchased in the IPO can return such shares to the Defendants named in

3    Count II and award recissory damages to those shares which Plaintiff Powell and the other

4    members of the Subclass purchased in the IPO but have since sold;

5        D.     Awarding Plaintiffs and the other members of the Class and Subclass

6    prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

7    and other costs; and

8        E.     Awarding such equitable, injunctive or other relief as this Court may deem just

9    and proper.

10   **JURY DEMAND**

11   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby

12   demands trial by jury of all issues that may be so tried.

13

14   Dated: April 11, 2012                **GREEN & NOBLIN, P.C.**

15                                           By: _Robert S. Green_

16                                           Robert S. Green (SBN 136183)

17                                           595 Market Street, Suite 2750
                                             San Francisco, CA  94105

18                                           Tel.: (415) 477-6700
                                             Fax: (415) 477-6710

19                                           Email: cand.uscourts@classcounsel.com

20                                           *Liaison Counsel*

21                                           **RIGRODSKY & LONG, P.A.**

22                                           Seth D. Rigrodsky
                                             Timothy J. MacFall

23                                           Scott J. Farrell
                                             825 East Gate Boulevard, Suite 300

24                                           Garden City, New York 11530
                                             Tel.: (516) 683-3516

25                                           Fax: (302) 654-7530

26                                           Email: sdr@rigrodskylong.com
                                                         tjm@rigrodskylong.com

27                                                       sjf@rigrodskylong.com

28                                           *Lead Counsel for Lead Plaintiff and the Class*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

00071898.000.docx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE WEISER LAW FIRM, P.C.**
Kathleen A. Herkenhoff (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858-794-1441
Facsimile: 858-794-1450

-and-

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
22 Cassatt Avenue, 1st Floor
Berwyn, PA 19312
Telephone: 610/225-2677
Facsimile: 610/408-8062

*Counsel for Plaintiff Powell*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 AND
THE SECURITIES EXCHANGE ACT OF 1934 - CASE NO. 4:11-CV-06599 (CW)

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Thomas J. Primo ("Plaintiff"), hereby declare as to the following claims asserted under the federal securities laws that:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or to participate in this action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition or trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in Pacific Biosciences of California, Inc. (Nasdaq: PACB) securities that are the subject of this action:

| No. of Shares | Stock Symbol | Buy/Sell | Transaction Date | Price Per Share |
|---|---|---|---|---|
| 1,500 | PACB | BUY | 7/7/2011 (Settlement Date) | $11.95 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*Please list additional transactions on separate sheet of paper, if necessary.*

5.   Plaintiff will actively monitor and vigorously pursue this action for the Class' benefit.

6.   Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification: _____ N/A _____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as the Court orders or approves.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this *15* day of *DECember*, 2011.

THOMAS J. PRIMO

2