IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

United States District Court
For the Northern District of California

| | |
|---|---|
| THOMAS J. PRIMO; and EVAN POWELL, individually and on behalf of all others similarly situated, | No. C 11-6599 CW |
| Plaintiffs, | ORDER GRANTING MOTIONS TO DISMISS (Docket Nos. 56 and 61) |
| v. | |
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.; HUGH C. MARTIN; SUSAN K. BARNES; BRIAN B. DOW; WILLIAM ERICSON; BROOK BYERS; MICHAEL HUNKAPILLER; RANDALL LIVINGSTON; SUSAN SIEGEL; DAVID SINGER; J.P. MORGAN SECURITIES LLC; MORGAN STANLEY & CO., INC.; DEUTSCHE BANK SECURITIES, INC.; and PIPER JAFFRAY & CO., | |
| Defendants. | |

Lead Plaintiff Thomas J. Primo and Plaintiff Evan Powell (collectively, Plaintiffs) assert claims on behalf of a putative class and subclass, for various violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Rules promulgated thereunder, against Defendants Pacific Biosciences of California, Inc. (PacBio); Hugh C. Martin, Susan K. Barnes and Brian B. Dow (collectively, the Officer Defendants); William Ericson, Brook Byers, Michael Hunkapiller, Randall Livingston, Susan Siegel and David Singer (collectively, with Martin, the Director Defendants); and J.P. Morgan Securities LLC, Morgan Stanley & Co., Deutsche Bank Securities Inc., Piper Jaffray & Co. (collectively, the Underwriter Defendants). Together, PacBio, the Officer Defendants and the Director Defendants are referred to as

the PacBio Defendants.  The PacBio Defendants and the Underwriter Defendants move to dismiss Plaintiffs' First Amended Complaint (1AC) in its entirety.  Plaintiffs oppose the motions.  Having considered the papers filed by the parties and their arguments at the hearing, the Court GRANTS both motions to dismiss, with leave to amend.

BACKGROUND

The following facts are alleged in Plaintiffs' 1AC.

Plaintiffs bring this putative class action suit against PacBio, nine of its officers and directors and four underwriting firms, on behalf of themselves and all persons or entities that purchased PacBio common stock between October 27, 2010, the day of PacBio's initial public offering (IPO), and September 20, 2011. 1AC ¶ 1.  Powell also brings claims on behalf of a subclass of all persons or entities that purchased PacBio common stock pursuant or traceable to PacBio's IPO.

PacBio, a biotechnology company formed in 2000, develops, manufactures and markets technology for genetic analysis.  1AC ¶¶ 14, 39.  In the offering materials prepared for its IPO, including the Prospectus and Registration Statements, PacBio explained that its initial focus was on the DNA sequencing market and that it had developed a "third generation" sequencing system called the PacBio RS, which addressed various limitations of earlier DNA sequencing methods.  Id. at ¶ 39.  "Combining recent advances in nanofabrication, biochemistry, molecular biology, surface chemistry and optics, [PacBio] created a technology platform called single molecule, real-time, or SMRT, technology."  Id.  PacBio represented that its "SMRT technology has the

United States District Court
For the Northern District of California

potential to advance scientific understanding by providing a window into biological processes that has not previously been open." Id.

Plaintiffs allege that the RS system "was supposed to be able to produce a complete, high quality human genome in a very short period of time," which could be utilized for, among other things, cancer research and diagnostics. Id. at ¶ 2. PacBio explained in its offering materials, "In order to understand the limitations of current DNA sequencing technologies, it is important to understand the sequencing process," which "consists of three phrases": "sample preparation, physical sequencing and re-assembly." Id. at ¶ 41. In the first phase, sample preparation, the target genome is broken into multiple small fragments, which may be amplified into multiple copies. Id. In the second phase, physical sequencing, "the individual bases in each fragment are identified in order, creating individual reads." Id. "The number of individual bases identified continuously" in a read is referred to as "readlength." Id. In the final, re-assembly phase, the overlapping reads are aligned and the original genome is assembled into a continuous sequence. Id. "The longer the readlength the easier it is to reassemble the genome." Id. The ability to use the assembled information is also dependent on "the accuracy of the assembled sequence." Id.

The offering materials explain that first generation sequencing technology had "relatively long readlengths" but was "limited by the small amounts of data that can be processed per unit of time, referred to as throughput." Id. Second generation methods achieved higher throughput but used processes that

introduced errors and resulted in short readlength.  Id.  The
offering materials proclaimed that the PacBio RS system "addresses
many of the limitations of the first and second generation
technologies, including short read lengths, limited flexibility,
long time to result, lower throughput" and other issues.  Id. at
¶ 42.

On October 27, 2010, the company conducted its IPO, raising
$230 million by selling shares at a price of sixteen dollars per
share.  Id. at ¶ 38.  Prior to its IPO, PacBio had obtained
funding primarily through investments from venture capital firms
and small government grants.  Id. at ¶ 37.

Plaintiffs allege that, in the offering materials and after
the IPO, Defendants made various misleading statements or failed
to disclose material information regarding the performance of the
PacBio RS system, which caused the PacBio common stock to be
artificially inflated throughout the class period.  Id. at ¶¶ 4-5.

On August 4, 2011, after the close of trading, Defendants
issued a press release and held an earnings call, in which
Plaintiffs contend Defendants disclosed some of the limitations of
the RS system.  Id. at ¶¶ 120-125.  The following day, on August
5, 2011, JP Morgan downgraded PacBio's rating because the company
had lowered its projection of sales.  Id. at ¶ 126.

Plaintiffs allege that the press release, earnings call and
JP Morgan report "shocked the market."  Id. at ¶ 127.  Shares of
PacBio had closed at $9.90 per share on August 4, 2011, and fell
to $6.50 per share by the close of trading on Friday, August 5,
2011 and to $5.60 per share by the close of trading on Monday,
August 8, 2011.  Id.

On September 20, 2011, PacBio announced that it would reduce its workforce by twenty-eight percent, with the reductions affecting most its operations and research and development functions. Id. at ¶ 130. PacBio's stock had closed at $5.56 per share on September 20, 2011 and fell to $4.25 per share by the close of trading the following day. Id. at ¶ 133.

Plaintiffs have attached to their 1AC a certification from Primo attesting that he purchased 1,500 shares of PacBio stock on July 7, 2011. Plaintiffs separately filed a certification from Powell attesting that he purchased fifty shares of PacBio stock on November 17, 2010, one hundred shares on May 2, 2011 and two hundred shares on August 5, 2011. Docket No. 26.

Plaintiff Powell asserts the following claims on behalf of himself and the putative subclass: (1) against all Defendants for violation of § 11 of the Securities Act, 1AC ¶¶ 58-65; (2) against PacBio, the Officer Defendants and the Underwriter Defendants for violation of § 12(a)(2) of the Securities Act, id. at ¶¶ 66-72; and (3) against the Officer Defendants and the Director Defendants for violation of § 15 of the Securities Act, id. at ¶¶ 73-75.

Both Plaintiffs assert the following claims on behalf of themselves and the putative class: (1) against PacBio and the Officer Defendants, for violation of § 10(b) of the Exchange Act and Rule 10b-5, id. at ¶¶ 154-64; and (2) against the Officer Defendants, violation of § 20(a) the Exchange Act, id. at ¶¶ 165-68.

                          LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.

United States District Court
For the Northern District of California

Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  In re Rigel Pharms., Inc. Sec. Litig., 2012 U.S. App. LEXIS 18743, at *13 (9th Cir.) (citing Twombly, 550 U.S. at 555). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

"In addition to the pleading requirements of Rule 8, there are more demanding pleading requirements for certain causes of action, especially securities fraud."  Rigel, 2012 U.S. App. LEXIS 18743, at *13-14.  Further, Rule 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  Semegen v.

United States District Court
For the Northern District of California

Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  Statements of the time, place and nature of the alleged fraudulent activities are sufficient, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1987), provided the plaintiff sets forth "what is false or misleading about a statement, and why it is false."  In re GlenFed, Inc., Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). Scienter may be averred generally, simply by saying that it existed.  See id. at 1547; Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally").  As to matters peculiarly within the opposing party's knowledge, pleadings based on information and belief may satisfy Rule 9(b) if they also state the facts on which the belief is founded.  Wool, 818 F.2d at 1439.

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint."  Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

DISCUSSION

Defendants contend that the 1AC constitutes an impermissible "puzzle pleading" and should be dismissed in its entirety for that reason.  Defendants also argue that Plaintiffs have failed adequately to plead a § 11 claim because they have not plead facts

United States District Court
For the Northern District of California

1   that show that the registration statement contained any material

2   omissions or misrepresentations.   Similarly, Defendants seek to

3   dismiss Plaintiffs' § 12(a)(2) claim because they have not alleged

4   any false or misleading statement in the prospectus.   They further

5   argue that Plaintiffs lack standing to bring a § 12(a)(2) claim.

6   PacBio Defendants also maintain that the § 12(a)(2) claim should

7   be dismissed against PacBio and the Officer Defendants because

8   they were not "sellers" of the securities.   PacBio Defendants seek

9   dismissal of the claim under § 10(b) and Rule 10b-5, arguing that

10  none of the challenged statements or omissions are actionable and

11  that Plaintiffs fail to plead scienter sufficiently.   Finally,

12  PacBio Defendants move to dismiss the § 15(a) and § 20(a) claims

13  because Plaintiffs have not adequately alleged the primary

14  violations under the Exchange Act or Securities Act and have not

15  alleged properly that the Officer and Director Defendants were

16  "controlling persons."

17  I.   Puzzle pleading

18       In a "puzzle pleading," the "plaintiffs have left it up to

19  defendants and the court to try to figure out exactly what the

20  misleading statements are, and to match the statements up with the

21  reasons they are false or misleading."   In re Autodesk, Inc. Sec.

22  Litig., 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000).

23       "In the context of securities class action complaints, courts

24  have repeatedly lamented plaintiffs' counsels' tendency to place

25  'the burden [] on the reader to sort out the statements and match

26  them with the corresponding adverse facts to solve the "puzzle" of

27  interpreting Plaintiffs' claims.'"   Wenger v. Lumisys, Inc., 2 F.

28  Supp. 2d 1231, 1244 (N.D. Cal. 1998) (quoting In re Oak Tech. Sec.

<u>Litig.</u>, 1997 U.S. Dist. LEXIS 18503, at *5 (N.D. Cal.) (formatting in original)). Courts recognize that such "'puzzle-style' complaints are an 'unwelcome and wholly unnecessary strain on defendants and the court system.'" <u>Id.</u> (quoting <u>GlenFed</u>, 42 F.3d at 1544); <u>see also</u> <u>Shuster v. Symmetricon, Inc.</u>, 1997 U.S. Dist. LEXIS 14007, at *9 (N.D. Cal.) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review . . . Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false presentation"); <u>In re Conner Peripherals, Inc.</u>, 1996 WL 193811, at *1 (N.D. Cal.) ("The complaint as written requires the court to excavate for actionable claims . . . Judicial resources are too scarce and worthy cases too pressing for a court to spend its time rooting around in bloated complaints by experienced lawyers for a handful of actionable allegations.").

Courts in this district have held that puzzle pleadings fail "to set forth a 'short and plain' statement of their claims in violation of Rule 8(a)," to "make each allegation 'simple, concise and direct'" in violation of Rule 8 and to fulfill the more exacting pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA) for violations of the Exchange Act. <u>In re Splash Tech. Holdings, Inc. Sec. Litig.</u>, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001); <u>Wenger</u>, 2 F. Supp. 2d at 1244.

Like the pleadings found to be lacking in many of the above cases, Plaintiffs' 1AC contains lengthy quotes and recitations of the contents of the offering materials and public comments made by

United States District Court
For the Northern District of California

Defendants.  In the allegations common to all of their claims,
Plaintiffs present a list of alleged omissions or misstatements
but fail to connect these to any particular statements made in the
offering materials.  See 1AC ¶ 51.  In the allegations specific to
their Exchange Act claims, Plaintiffs make some attempt to connect
the alleged omissions to particular statements but continue to do
so in a general manner that requires the reader to guess what
particular statements they mean or how those statements were
rendered false and misleading.  See, e.g., 1AC ¶ 85 ("The failure
to state in the Prospectus that the Company expected to 'have lots
of bugs' with the PacBio RS, that the 'performance envelope'
needed to be validated, and that systems were unstable and needed
to be incrementally increased demonstrated that the statements
describing the PacBio RS in the prospectus [were] materially false
and misleading.").

Plaintiffs argue that their 1AC is sufficient because
Defendants are able to "discern which omissions or
misrepresentations form the basis of their claims" well enough to
draft a motion to dismiss.  Opp. at 9.  However, that Defendants
were able to argue that the pleading was inadequate does not
establish that it provided them with sufficient notice of the
claims against them.  Defendants are not required to guess at the
basis of Plaintiffs' claims.  Instead, Plaintiffs have the burden
to present at least a "short and plain statement" of their claims.
Moreover, in their papers, Defendants did not evidence a clear
understanding of the statements that Plaintiffs challenge.

Because Plaintiffs have failed to set forth a "short and
plain statement" of their claims in violation of Rule 8(a), to

make their allegations "simple, concise and direct" in violation of Rule 8(d) or to fulfill the requirements of the PSLRA for their Exchange Act claims, the Court GRANTS Defendants' motion to dismiss the 1AC in its entirety.

II. Claim against all Defendants for violation of § 11 of the Securities Act

A. Legal standard

"Section 11 creates a private remedy for any purchaser of a security if any part of the registration statement, 'when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1403 (9th Cir. 1996) (quoting 15 U.S.C. § 77k(a)). "'The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'" Id. at 1403-04 (quoting Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994)). "'No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions.'" Id. at 1404 (quoting Kaplan, 49 F.3d at 1371). For an omission to be material and actionable, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 1408 (internal quotation marks and citations omitted); see also Basic Inc. v.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   <u>Levinson</u>, 485 U.S. 224, 231 (1988) (an "omitted fact is material

2   if there is a substantial likelihood that a reasonable shareholder

3   would consider it important" in making a decision); <u>No. 84</u>

4   <u>Employer-Teamster Joint Council Pension Trust Fund v. Am. W.</u>

5   <u>Holding Corp.</u>, 320 F.3d 920, 934 (9th Cir. 2003) (same).

6        Defendants contend that Plaintiffs' § 11 claim and other

7   claims under the Securities Act sound in fraud and therefore are

8   subject to Rule 9(b)'s heightened pleading standards.  See <u>Rubke</u>

9   <u>v. Capitol Bancorp, Ltd.</u>, 551 F.3d 1156, 1161 (9th Cir. 2009); <u>In</u>

10  <u>re Daou Sys., Inc.</u>, 411 F.3d 1006, 1027 (9th Cir. 2005); <u>Vess v.</u>

11  <u>Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103-1104 (9th Cir. 2003).

12  Plaintiffs respond that they have "carefully distinguished their

13  Securities Act claims from those under the Exchange Act and Rule

14  10b-5, which requires allegations of fraud and scienter," that

15  they have "expressly disclaim[ed] any allegation of fraud for

16  those claims" and that their "Section 11 claim was not dependent

17  on the fraud allegations relevant to their Section 10(b) claims."

18  Opp. at 11-12.

19       "To ascertain whether a complaint 'sounds in fraud,'" a court

20  "must normally determine, after a close examination of the

21  language and structure of the complaint, whether the complaint

22  'allege[s] a unified course of fraudulent conduct' and 'rel[ies]

23  entirely on that course of conduct as the basis of a claim.'"

24  <u>Rubke</u>, 551 F.3d at 1161 (quoting <u>Vess</u>, 317 F.3d at 1103-04)

25  (formatting in original).  A plaintiff "may choose not to allege a

26  unified course of fraudulent conduct in support of a claim, but

27  rather to allege some fraudulent and some non-fraudulent conduct."

28  <u>Vess</u>, 317 F.3d at 1104.  "In such cases, only the allegations of

1  fraud are subject to Rule 9(b)'s heightened pleading

2  requirements." Id.

3      Here, Plaintiffs have made conscious efforts to separate

4  their Securities Act claims from the fraud allegations in their

5  Exchange Act claims; the facts that are related to the Securities

6  Act claims are incorporated into the Exchange Act claims, but the

7  reverse is not true.  The 1AC's causes of action under §§ 11,

8  12(a)(2) and 15 of the Securities Act expressly disclaim any

9  allegations that "allege fraud, scienter or the intent of the

10 defendants to defraud Plaintiff Powell or members of the

11 subclass."  1AC ¶¶ 58, 66, 73.   Although there are allegations in

12 the 1AC that some of Defendants' conduct in violation of the

13 Exchange Act was fraudulent, Plaintiffs are permitted to plead

14 their claims in the alternative in this manner.  Fed. R. Civ. P.

15 8(d)(2),(3).

16     Accordingly, because Plaintiffs' claims under the Securities

17 Act do not sound in fraud, they are not required to meet the

18 particularity pleading standards in Rule 9(b).

19     B. Misrepresentation or omission of a material fact

20     Defendants contend that Plaintiffs have not plead facts

21 sufficient to show that the registration statement contained any

22 false statements of material fact or omitted material facts

23 necessary to make the statements in the statement not misleading.

24     In the 1AC, Plaintiffs allege that the offering materials,

25 including the registration statement and prospectus, contained the

26 following "untrue statements of material fact and/or omitted

27 material facts":

28

United States District Court
For the Northern District of California

(1) omitted that PacBio's human gene sequencing technology in fact did not have a 99.99% accuracy rate or misstated that it did have a 99.99% accuracy rate;

(2) misstated that the PacBio RS system would not require upgrades and/or replacement of instrument hardware;

(3) misstated that there were plans to further develop applications for the PacBio RS system, as these applications could not be introduced commercially;

(4) omitted that the initial "limited production release program" was in fact a "beta test program;"

(5) omitted that the PacBio RS system had a significant number of "bugs" that would affect the system's performance;

(6) omitted that the PacBio RS system's performance envelope needed to be validated;

(7) omitted that the PacBio RS's systems were unstable and needed to be incrementally increased;

(8) omitted that the Company would experience "variability;"

(9) omitted that the accuracy rate was critical to the Company's customers;

(10) omitted that there were in fact "trade offs" involving the Company's products, such as running the equipment in either "read length" or "accuracy" mode; and

(11) omitted that the $50 million pre-IPO investment by Gen-Probe was in actuality a down payment for a system that would allow Gen-Probe to obtain a 50% discount.

1AC ¶ 51.  In their opposition, Plaintiffs have not defended the sufficiency of their allegations as to the ninth and eleventh items on the above list.  The remaining alleged misrepresentations or omissions are discussed below.

    1. Accuracy rate

    In the 1AC, Plaintiffs allege that the offering materials omitted or misrepresented a material fact because they did not disclose that the "PacBio's human gene sequencing technology in

1  fact did not have a 99.99% accuracy rate." 1AC ¶ 51(1).  In their

2  opposition, although not in the 1AC, they tie this allegation to

3  the following statements in the registration statement:

4  <u>Using the PacBio RS</u>

5  The PacBio RS delivers a complete product solution from
   sample preparation to biological results. The instrument

6  has the capability for multiple sequencing protocols,
   enabling a high degree of flexibility in experimental

7  design.

8  -   Standard sequencing.  The standard SMRT sequencing
   protocol is designed to generate single pass long reads.

9  The protocol uses long insert lengths so that the
   polymerase can continuously synthesize along a single

10 strand.  As with all protocols, this process runs in
   parallel across thousands of ZMWs in a single SMRT Cell

11 at the same time.  This protocol has utility for a range
   of both resequencing and <u>de novo</u> applications.  <u>Our</u>

12 <u>system achieves consensus accuracy of 99.99% which is</u>
   <u>commensurate with leading second generation sequencing</u>

13 <u>systems.</u>

14 -   Circular consensus sequencing.  The PacBio RS has
   the capability for circular consensus sequencing.  The

15 circular consensus sequencing protocol uses a circular
   DNA template which enables multiple reads across the

16 same sequence to achieve 99.99% accuracy at single
   molecule resolution from a single DNA strand.

17 Furthermore, this approach provides reads on both the
   forward and reverse strands of a double stranded

18 template.  This method offers potential advantages for
   the discovery and confirmation of rare variants.

19

20

21

22

23

24

25

26

27

28

Opp. at 13-14 (citing 1AC ¶ 45) (emphasis in original); see also

Moreno Decl., Ex. 2, 62.[1]  In their opposition, Plaintiffs defend

this allegation by arguing that the two references to 99.99%

accuracy in these paragraphs were false or misleading because,

after the registration statement was filed, certain Defendants

stated on a number of occasions that "raw read accuracy was

nowhere near 99.99% and never would be."  Opp. at 14.

    In their motion, Defendants argue that Plaintiffs are

conflating two concepts, raw read accuracy and consensus accuracy,

and that the registration statement never claimed that raw read

accuracy was 99.99%.  Mot. at 15-16.  Plaintiffs respond that the

difference between these terms is incomprehensible to a reasonable

investor, that the registration statement did not explain the

difference, that Defendants had a duty to disclose material facts

which are not easily understood, and that the omission, in

conjunction with the claims about 99.99% accuracy, could mislead a

reasonable investor.  Opp. at 14-15.  Defendants reply that the

registration statement makes clear that the 99.99% accuracy rate

referred to consensus accuracy, that they were not required to

disclose the raw read accuracy rate because they did not have to

_____

    [1] Defendants request that the Court take judicial notice of
various documents referenced in, or attached to, the 1AC.  They
also request that the Court take judicial notice of documents
filed with the United States Securities and Exchange Commission
(SEC), market analyst reports, earnings call transcripts and
PacBio's historical stock prices, which they contend are capable
of immediate determination by resort to accurate sources and not
subject to reasonable dispute.  The 1AC also refers to some of
these documents.  Further, they ask that the Court take judicial
notice of Plaintiffs' certifications reflecting stock purchases,
which were attached to or filed in connection with the 1AC.
Plaintiffs do not oppose Defendants' requests.  Accordingly, the
Court GRANTS Defendants' request for judicial notice.

United States District Court
For the Northern District of California

reveal every detail about the RS system and that Plaintiffs cannot point to any statement in the registration statement which was rendered misleading or untrue by their omission to disclaim this statistic. Defendants also challenge Plaintiffs' assertion that the subject matter was incomprehensible.

Plaintiffs do not argue that the statements in the registration statement regarding accuracy were literally untrue. Instead, they contend that the statements, while true, were nonetheless misleading, apparently because they conveyed a general sense that the system was 99.99% accurate, even though the raw read accuracy rate was lower. The Ninth Circuit has "recognized that statements literally true on their face may nonetheless be misleading when considered in context." Miller v. Thane Int'l, Inc. (Miller I), 519 F.3d 879, 886 (9th Cir. 2008) (quoting In re Convergent Tech. Sec. Litig., 948 F.2d 507, 512 (9th Cir. 1991)) ("'Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'").

Plaintiffs, however, have likewise not plead sufficiently that these statements were misleading in their context. Contrary to Plaintiffs' characterization, in describing the DNA sequencing process, the registration statement clearly disclosed that there are two distinct types of accuracy. It noted that the "ability to use sequence-based information is contingent not only on assembly, but the accuracy of the assembled sequence," and stated, "There

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

are two principal forms of accuracy that are commonly cited, referred to as raw read accuracy and finished or consensus accuracy." Moreno Decl., Ex. 2, 57.  Although the registration statement did not explain the two terms in great detail, it did disclose that there was a difference between the two and they were distinct terms and concepts: in discussing the reassembly step of DNA sequencing, it stated that raw read accuracy "can be a platform specific performance metric while consensus accuracy is critical to successful reassembly." Id.  The statement also made clear that circular consensus accuracy reflected the results of "multiple reads across the same sequence." Id. at 62.  The passages cited by Plaintiffs and quoted above made clear that the 99.99% accuracy rate identified in the registration statement referred to consensus accuracy.  In contrast, the registration statement made no representation regarding the raw read accuracy rate of the RS system.

Plaintiffs assert, "A reasonable investor easily could have been misled by the assertions in the Offering Materials about the RS's 99.99% accuracy." Opp. at 14.  However, no claim was made in the registration statement about an overall accuracy rate. Instead, one was made about consensus accuracy and the accuracy achieved through circular consensus sequencing.  Accordingly, Plaintiffs have not sufficiently plead that Defendants made a material misrepresentation about the accuracy rate of the RS system.

    2. Trade offs

Plaintiffs also allege that the offering materials were misleading or untruthful because they failed to disclose "that

there were in fact 'trade offs' involving the Company's products, such as running the equipment in either 'read length' or 'accuracy' mode." 1AC ¶ 51(10). Plaintiffs state that Martin admitted there was a trade off between readlengths and accuracy rates during a post-IPO earnings calls on February 15, 2011 and August 4, 2011, and stated that the company might offer a readlength mode and an accuracy mode. Id. at ¶¶ 102, 125. At the hearing, Plaintiffs clarified: they claim the registration statement promised that the RS system had a 99.99% accuracy rate and long readlengths but did not disclose that this accuracy rate can be attained only for shorter readlengths than those described in the statement and that, when readlengths are increased, accuracy rates go down.

Although Plaintiffs state that the RS system could not "have performed as promised when the Offering Materials said nothing about trade-offs," Opp. at 16, Plaintiffs do not identify any particular parts of the registration statement that they rely on for the purported promises. Specifically, they do not state what portions of the registration statement contained promises about long readlengths that were rendered misleading or false by the failure to disclose a trade off between accuracy and readlength. The Court finds that their failure to do so renders this allegation deficient.

In their motion, Defendants also argue that the trade off to which Martin referred in the August 4, 2011 call explicitly pertained to circular consensus sequencing and "that the notion of a 'trade off' between read length and consensus accuracy is inherent in the very concept" of this type of sequencing. PacBio

19

United States District Court
For the Northern District of California

Ds.' Mot., 19. They explain that, because the circular consensus sequencing protocol uses multiple reads across the same DNA sequence to achieve the 99.99% accuracy rate, the length of the reads was necessarily reduced because the same sections had to be read multiple times. PacBio Ds.' Reply, 8 n.7; PacBio Defs.' Mot., 19. Thus, they explain that, although the offering materials stated the RS system "demonstrated readlengths greater than 1,000 base pairs on average," in order to get a 99.99% circular consensus accuracy rate, one would have to sequence a smaller DNA strand repeatedly and thus would be limited to a shorter readlength, of 500 pairs. PacBio Ds.' Reply, 8 n.7; PacBio Defs.' Mot., 19. They contend that, because this was obvious from the technology itself, they were not obliged to disclose it.

However, at this stage, Defendants have not demonstrated that this understanding of the technology would have been obvious to the reasonable investor such that it did not need to be disclosed in the registration statement. In contending that this was inherent in the technology, Defendants rely primarily on a detailed understanding of the technology that cannot be assumed of reasonable investors. The statement repeatedly referred to long readlengths and stated that the PacBio RS had "demonstrated readlengths greater than 1,000 base pairs on average with instances of over 10,000 base pairs" and attained a 99.99% consensus accuracy rate. However, it did not indicate that these readlengths could only be achieved using a single pass or that it would decrease when using the circular consensus sequencing mode

1    or other techniques necessary to achieve a high consensus accuracy
2    rate.

3         Further, Defendants' cited authority does not support this
4    argument.  One case that they cite stands for the proposition
5    that, in the context of a fraud on the market theory for a
6    securities fraud claim, a presumption of reliance can be rebutted
7    if the omitted information was already credibly available to the
8    market from other sources.  See Hillson Partners Ltd. Partnership
9    v. Adage, Inc., 42 F.3d 204, 212 (4th Cir. 1994) (citing, among
10   others, In re Apple Computer Sec. Litig., 886 F.2d 1109, 1114-15
11   (9th Cir. 1989)).  That legal proposition is inapplicable to the
12   instant analysis.  Further, none of the allegations here supports
13   that this information about the RS system was readily available to
14   the reasonable investor.  In Defendants' other case, Vaughn v.
15   Teledyne, Inc., 628 F.2d 1214 (9th Cir. 1980), the Ninth Circuit
16   reviewed the district court's summary judgment order on a claim
17   for securities fraud under § 10(b) of the Exchange Act to assess
18   whether there was a material dispute of fact that a scheme to
19   defraud existed.  The court observed, "Any tender offer or
20   acquisition by a company of its own stock obviously would reduce
21   the number of outstanding shares and increase the proportionate
22   control and earnings of all shareholders who retained their
23   stock," but stated, "It is not a violation of any securities law
24   to fail to disclose a result that is obvious even to a person with
25   only an elementary understanding of the stock market."  Id. at
26   1220 (citing Ala. Farm Bureau Mutual Casualty Co., Inc. v. Amer.
27   Fidelity Life Ins. Co., 606 F.2d 602, 611 (5th Cir. 1979)).  Here,
28   the purportedly obvious fact is not a basic function of the stock

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   market of which investors would be aware; it is instead a concept

2   that is part of the technology.

3        In addition, contrary to Defendants' conclusory statement,

4   the fact that the offering materials stated that there were

5   "multiple sequencing protocols, enabling a high degree of

6   flexibility in experimental designs," did not disclose that there

7   were trade offs between long readlengths and accuracy.  The

8   descriptions of these protocols did not explain, for example, that

9   one protocol could be used for longer readlengths and another for

10  a high level of accuracy.  In fact, the first protocol discussed

11  referred both to "long reads" and to a 99.99% consensus accuracy.

12  Moreno Decl., Ex. 2.

13            3. Upgrades or replacement of the hardware

14       Another omission or misrepresentation of material fact in the

15  offering materials alleged by Plaintiffs was that the documents

16  failed to disclose "that the PacBio RS system would require

17  upgrades and/or replacement of instrument hardware."  1AC ¶ 51.

18  Defendants contend that Plaintiffs have not plead facts supporting

19  their claim that improvements to the RS system would in fact

20  require any upgrade or replacement of instrument hardware.

21       In their opposition, Plaintiffs tie this claim to the

22  following passage in the offering materials, which was repeated

23  several times:  "The design of the PacBio RS will allow for

24  significant performance improvements without an upgrade or

25  replacement of the instrument hardware.  These performance

26  enhancements will be delivered through software upgrades and new

27  consumables."  Opp. at 16 (quoting 1AC ¶¶ 39, 44, 47).  Plaintiffs

28  contend that this was omitted from "otherwise identical language"

in PacBio's 2010 Form 10-K.  Opp. at 17.  They claim that this
omission, in combination with a statement in the Form 10-K that
"our engineering teams will continue their focus on increasing
instrument component, system reliability, reducing costs,
increasing sample thoroughput, and implementing additional system
flexibility and versatility," id. (quoting 1AC ¶¶ 110-11), shows
that the PacBio RS would require an upgrade or replacement of the
instrument hardware in order to achieve performance improvements.
Thus, they conclude that the statements to the contrary in the
offering materials were false.  Id.

     However, as Defendants point out, the Form 10-K does not
support a finding that the statements in the offering materials
were false or misleading or created a false and misleading
impression.  Instead of using a sentence identical to the sentence
in the offering materials, the Form 10-K stated that the RS is
"designed for expandable capability to permit performance
improvements and new applications to be delivered through
chemistry and software enhancements without necessitating changes
to the hardware."  Moreno Decl., Ex. 6, 6.  The Form 10-K
essentially replaced the offering materials' phrase "software
upgrades and new consumables" with "chemistry and software
enhancements."  The offering materials defined PacBio's
"proprietary consumables" to include their "SMRT Cells and . . .
chemical reagent kits."  Moreno Decl., Ex. 2, 1, 3.  Thus, these
phrases are essentially equivalent.  Plaintiffs have plead no way
in which they materially differ or that any difference was
misleading or false.

**United States District Court**
For the Northern District of California

1    Plaintiffs respond that this additional sentence in the Form

2   10-K only shows that the Form 10-K also "contained a materially

3   false and misleading statement."  Opp. at 17 n.18.  However, in

4   the 1AC, Plaintiffs did not allege that the statement in the

5   offering materials was false and misleading because performance

6   enhancements to the RS in fact required changes to the hardware

7   itself.  Instead, they alleged that the offering materials were

8   false and misleading because the "omission of the sentence" that

9   appeared in the offering materials "from the 2010 Form 10-K could

10  only mean that such enhancements could not be accomplished through

11  'software upgrades and new consumables'" and thus that "they would

12  have to be accomplished through changes to the hardware itself."

13  1AC ¶¶ 111-12.  Thus, that the additional sentence in the 2010

14  Form 10-K was consistent with the offering materials undermines

15  Plaintiffs' allegation that the differences between the documents

16  showed that the offering materials were false and misleading.

17    Accordingly, Plaintiffs have failed to allege sufficiently

18  any material omission or misleading statement in the offering

19  materials regarding required upgrades or replacement of the

20  hardware.

21    4. No future plans to further develop applications

22    Plaintiffs allege that the offering materials were misleading

23  or false based on the failure to disclose "that there were no

24  plans to further develop applications for the PacBio RS system, as

25  these applications could not be introduced commercially."  1AC

26  ¶ 51.

27    In their opposition, but not their pleading, Plaintiffs tie

28  this claim to the following passage in the offering materials:

> We believe that the power of SMRT detection extends beyond DNA sequencing to the detection and characterization of other fundamental biological functions. The ability of the SMRT technology to observe kinetic information of individual molecules provides the ability to detect nucleic acid variations, including detection of base modifications and the detection of binding of biomolecules to DNA. SMRT detection has been applied by researchers to directly observe, on a single molecule basis, transcription, reverse transcription, translation and ligand binding. Although these applications will not be available at the commercial launch of the PacBio RS, we plan to further develop them and, if successful, we may commercially introduce them in the future.

Opp. at 17 (quoting 1AC ¶ 48).

Plaintiffs argue that the final sentence in this passage was false or misleading because there were in fact "no plans to 'further develop'" the applications. Opp. at 18. They contend that Martin's later comments revealed that "the Company's efforts were devoted to making the PacBio RS commercially viable, not to developing new applications." Id. Plaintiffs further argue that any "[p]lans to develop future applications, which had never existed, were . . . dead," after PacBio announced on September 20, 2011 that it was reducing its workforce by 28%, affecting most the operations and research and development functions." Id.

However, none of Plaintiffs' arguments or allegations supports the conclusion that the statement in the offering materials was misleading or created a false impression. Even if PacBio devoted its time initially to making the RS system commercially viable, this did not mean that it did not intend to develop other applications later. Further, the layoffs more than a year after the IPO does not show anything about the company's intentions at the time of the IPO. As Defendants point out, that it had a large research department to cut suggests that PacBio was

**United States District Court**
For the Northern District of California

1    investing in such development.  Finally, PacBio did disclose in

2    the offering materials that development of future applications

3    could be hindered by problems with cash and resources.  <u>See</u> Moreno

4    Decl., Ex. 2, 11 ("We may be unable to develop our future

5    commercial applications. . . . These future commercial

6    applications will require significant investments of cash and

7    resources and we may experience unexpected delays or difficulties

8    that could postpone our ability to commercially launch these

9    future applications . . .").

10       Accordingly, Plaintiffs have failed to allege any material

11   omission or misleading statement in the offering materials related

12   to plans to develop future applications.

13           5. Issues related to beta testing and bugs

14       Plaintiffs also allege that the offering materials failed to

15   disclose "that the initial 'limited production release program'

16   was in fact a 'beta test program,'" 1AC ¶ 51(4), "that the PacBio

17   <u>RS</u> system had a significant number of 'bugs' that would affect the

18   system's performance," <u>id.</u> at ¶ 51(5), "that the PacBio RS

19   system's performance envelope needed to be validated," <u>id.</u> at

20   ¶ 51(6), "that the RS's systems were unstable and needed to be

21   incrementally increased," <u>id.</u> at ¶ 51(7), and "that the Company

22   would experience 'variability,'" <u>id.</u> at ¶ 51(8).

23       Plaintiffs contend that they adequately alleged that the

24   description of the limited production release (LPR) program for

25   the <u>RS</u> system did not use the word "beta" or the phrase "beta

26   test," that the description portrayed the <u>RS</u> system as having

27   moved past beta testing to "initial production," and thus that the

28   offering materials concealed from the investors the true status of

the LPR program as a beta test for the <u>RS</u> system.  Opp. at 18-19.
Plaintiffs further argue that, "[b]ecause the Offering Materials
did not describe the LPR as a beta test, or something truly
equivalent, reasonable investors had no reason to know" that "the
Company's 'expectation [was] in the beginning we would have lots
of bugs, . . . and be able to validate the initial beta
performance envelope,'" that "[o]ver time, the systems would
become more stable and we would then start to incrementally
increase the performance with consumables and software upgrades,"
and that there would be issues with "performance variability."
Opp. at 19-20 (quoting 1AC ¶ 84).  Thus, they argue that these
other issues were concealed by the failure to disclose fully the
status of the LPR program as a beta program.

Plaintiffs have alleged no unique meaning for the terms
"beta" or "beta test."  Plaintiffs state in their opposition that
the terms "are common in the computer hardware and software
industry."  Opp. at 18.  However, the technology at issue here
does not concern the computer hardware and software industry and
they have not alleged in the 1AC that the terms are commonly used
in other industries.  The <u>Merriam-Webster Dictionary</u> defines beta
as "a nearly complete prototype of a product (as software)."  <u>See</u>
"beta," <u>Merriam-Webster Dictionary</u>, http://www.merriam-
webster.com/dictionary/beta (last visited October 2, 2012).  It
defines beta test as "a field test of the beta version of a
product (as software) especially by testers outside the company
developing it that is conducted prior to commercial release."  <u>See</u>
"beta test," <u>Merriam-Webster Dictionary</u>, http://www.merriam-
webster.com/dictionary/ beta%20test (last visited October 2,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   2012).  <u>See also</u> "beta test," <u>Oxford English Dictionary</u>,

2   http://www.oed.com/view/Entry/18257 (last visited October 2, 2012)

3   (defining "beta test" as "a test of machinery, software, etc. in

4   course of final development, carried out by a party or parties

5   unconnected with the developer").

6        Defendants do not contest that the LPR program was a beta

7   program, within the dictionary definition of that term.  Instead,

8   they argue that the offering materials sufficiently disclosed that

9   the program was a platform for testing and improving pre-

10  commercial versions of the <u>RS</u> system, the equivalent of a beta

11  test, and that the <u>RS</u> system would contain defects or errors, even

12  after commercial release.

13       The offering materials included at least two descriptions of

14  the LPR program.  The shorter description appeared in the

15  Prospectus Summary, Moreno Decl., Ex. 2, 3, and a longer

16  description appeared in the body of the prospectus in the

17  "Business" section, <u>id.</u> at 68.  The longer description stated,

18       We instituted a limited production release program
         pursuant to which we received orders for eleven limited
19       production release instruments from entities such as
         genome centers, clinical, government and academic
20       institutions and agricultural companies.  This program
         was designed to help us garner quality feedback on the
21       product prior to our full commercial launch scheduled
         for early 2011.  We received orders for our limited
22       production release instrument from [eleven
         institutions.]  As of September 15, 2010, we have
23       shipped a total of seven PacBio <u>RS</u> limited production
         release instruments, and we intend to ship the remaining
24       four later this year.  Limited production release
         instruments are designed to provide early access to the
25       technology, while we complete the research, development
         and testing required for full commercial release.
26       Therefore, performance during the limited production
         release phase will not be equal to that of the system at
27       commercial release.  There will be a continuous
         evolution of these performance variables, including
28       readlength and throughput, during the limited production

release phase as we develop new versions of our software and consumables.  During a testing period, which we expect to last at least through the end of 2010, we will be working with these customers to obtain feedback and plan to incorporate relevant improvements into the commercial release version of the PacBio <u>RS</u>.  Generally, each customer is obligated to pay us a deposit after accepting a limited production release instrument, and is entitled to receive an upgrade to a commercial release version of the PacBio <u>RS</u>, at which time each customer will be obligated to pay the balance of their order and we will then recognize revenue.  While we expect to deliver upgrades to all of these customers, we cannot provide assurance that we will succeed and recognize revenue from our limited production release customers.

<u>Id.</u>  This description of the LPR program comports with the dictionary definition of a beta program and does not give an impression that the LPR program was anything other than such a program.  Defendants did not need to use the word "beta" itself to convey what the LPR program was.

Plaintiffs contend that the description nevertheless concealed the beta status for several reasons.  They argue that the "recipients of the machines were called 'customers,'  . . . as opposed to 'users' or 'evaluators,'" who placed "orders" for the instrument rather than volunteered to serve as testers and were "obligated to pay a deposit" and to "pay . . . the balance of the order" upon getting the commercial release product.  Opp. at 19.  However, this is not persuasive.  Customers and potential customers frequently perform beta testing, which is used to test a product in a non-laboratory setting to see how it will perform when used in actual, real world applications.  <u>See</u> <u>Am. Trim, LLC v. Oracle Corp.</u>, 383 F.3d 462, 466-467 (6th Cir. 2004) ("In the software industry, 'Beta release' refers to a stage of software development in which the software is released to a limited number of customers for testing and further development before being

released to the general public."); <u>Dowty Communs. v. Novatel</u>
<u>Computer Sys. Corp.</u>, 817 F. Supp. 581, 590 (D. Md. 1992) ("Beta
testing refers to product testing at a customer location,
attempting tasks the product was designed to perform.  Alpha
testing, by contrast, is done by a manufacturer, in its
laboratory, using test equipment."); <u>see also</u> <u>Oxford English</u>
<u>Dictionary</u>, http://www.oed.com/view/Entry/18257 (last visited
October 2, 2012) (defining "beta customer" as "a person or company
(usually a potential purchaser) involved in beta-testing a
product").  That the offering materials made clear that the
customers involved had to give a "deposit" when they received the
LPR instrument is not surprising, given that it was an expensive
instrument, which the customers would use at their own sites.
Plaintiffs also do not make clear how requiring payment for the
balance of the cost of the commercial release model would imply
that the LPR device was not a beta device.  To the extent that
Plaintiffs suggest that customers were required to upgrade to a
commercial release version, the offering materials did not make
such a representation and stated instead that the customers were
"entitled to receive an upgrade," as quoted above.  In fact, the
materials also specifically noted that the company might not be
able to "succeed" and "deliver upgrades to all of these
customers."  Even if customers were required to upgrade,
Plaintiffs do not explain how this suggested that the LPR program
was not a beta test.  Thus, Plaintiffs have not alleged adequately
any material omission or material misstatement regarding the
status of the LPR program as a "beta" program.

United States District Court
For the Northern District of California

Further, Plaintiffs have not adequately alleged that the description of the LPR program concealed or omitted that it would have "bugs" that would affect the system's performance, that the performance would increase incrementally or that there would be performance variability.  First, the description of the LPR program specifically stated that "performance during the limited production release phase will not be equal to that of the system at commercial release."  It further stated that the program would involve "a continuous evolution of these performance variables, including readlength and throughput, during the limited production release phase as we develop new versions of our software and consumables."  Finally, the offering materials also disclosed, "Any product using our SMRT technology will be complex and may develop or contain undetected defects or errors," and "We cannot assure you that a material performance problem will not arise."  Moreno Decl., Ex. 2, 16.  See Oxford English Dictionary, http://www.oed.com/view/Entry/24352 (last visited October 2, 2012) (defining "bug" as, among other things, "A defect or fault in a machine, plan, or the like").

C. Summary

Accordingly, the Court GRANTS Defendants' motion to dismiss the § 11 claim in its entirety.  The Court finds that Plaintiffs have not sufficiently plead any misrepresentation or omission in the offering materials.  Plaintiffs are granted leave to amend this claim to remedy the deficiencies identified above, provided that they are able to do so truthfully and meet the pleading requirements of Rule 8.

III. Claim against PacBio, the Officer Defendants and the Underwriter Defendants for violation of § 12(a)(2) of the Securities Act

A. Legal standard

Section 12(a)(2) of the Securities Act imposes civil liability on "any person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . ." 15 U.S.C. § 77l(a)(2). "Accordingly, to prevail under Section 12(a)(2), a plaintiff must demonstrate (1) an offer or sale of a security, (2) by the use of a means or instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading by any person." Miller v. Thane Int'l (Miller II), 615 F.3d 1095, 1099 (9th Cir. 2010) (citations and internal quotation marks omitted). "The Act defines 'person' to include individuals and corporations." Id. (citing 15 U.S.C. § 77b(a)(2)). "Additionally, '[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Section 12(a)(2)] shall also be liable jointly and severally with and to the same extent as such controlled person.'" Id. (quoting 15 U.S.C. § 77o) (formatting in original).

United States District Court
For the Northern District of California

B. Discussion

    1. Misrepresentation or omission of material fact

    Defendants argue that Plaintiffs have failed to allege a misrepresentation or omission of material fact in the prospectus for the same reasons addressed above regarding the § 11 claim. Plaintiffs do not respond to this argument or provide any reason to differentiate the two claims for this purpose. Accordingly, because the Court has found that Plaintiffs failed to allege a misrepresentation or omission of material fact in the offering materials in general, the Court reaches the same conclusion for the prospectus for the purposes of this claim.

    2. Standing

    The parties disagree as to whether either named Plaintiff has standing to bring the § 12(a)(2) claim and on the role of the Supreme Court's decision in <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 574 (1995), in this determination. Defendants argue that Plaintiffs' certifications, submitted with the 1AC, reveal that neither Plaintiff purchased his shares in the public offering on October 27, 2010 and instead they purchased their shares in aftermarket transactions. Plaintiffs do not dispute that Primo lacks standing to bring this claim. Instead, they contend that Powell has standing because aftermarket purchases made less than ninety days after the IPO are actionable and he purchased at least some of his shares on November 17, 2010, less than ninety days after the IPO. Opp. at 27-28; <u>see also</u> 1AC ¶ 13 (alleging that Powell "purchased PacBio securities pursuant and/or traceable to the IPO at artificially inflated prices").

33

United States District Court
For the Northern District of California

"Section 12(a)(2) provides that any person who 'offers or sells' a security by means of a prospectus containing a materially false statement or material omission shall be liable to any 'person purchasing such security from him.'"  In re Wells Fargo Mortg. Backed Certificates Litig., 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010) (quoting 15 U.S.C. § 77l(a)(2)).  In Gustafson, the Supreme Court addressed the meaning of the word "prospectus" under the Securities Act.  513 U.S. at 566-84.  The Ninth Circuit has since recognized that "[d]icta in Gustafson indicate that a suit under Section 12 may only be maintained by a person who purchased the stock in the offering under the prospectus."  Hertzberg v. Dignity Partners, 191 F.3d 1076, 1081 (9th Cir. 1999); see also Gustafson, 513 U.S. at 571-72, 578 ("The intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings.").  In Hertzberg, the Ninth Circuit distinguished between §§ 11 and 12 on the basis that "Section 11 permits suit without restriction by 'any person acquiring such security,'" while, in contrast, § 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security from him,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus."  191 F.3d at 1081.  The court referred to this as § 12's "express privity requirement."  Id.

"There is no clear appellate authority as to whether aftermarket purchasers may have § 12(a)(2) standing."  In re Wash. Mut., Inc. Sec., 694 F. Supp. 2d 1192, 1225 (W.D. Wash. 2009).  Some district courts have held that aftermarket purchasers have standing "so long as that aftermarket trading occurs 'by means of

a prospectus or oral communication.'"  Feiner v. SS&C Techs., Inc., 47 F. Supp. 2d 250, 253 (D. Conn. 1999) (quoting 15 U.S.C. § 77l).  In Feiner, the district court held that § 12(a)(2) liability can extend for as long as a prospectus is required under the statutory and regulatory framework to have been delivered and rejected the defendants' attempts to limit liability to shares purchased in the initial distribution.  Id.

Other courts, including those in the Northern District of California that have considered this issue, have found that § 12(a)(2) liability does not extend to aftermarket transactions. In In re Levi Strauss & Co. Sec. Litig., 527 F. Supp. 2d 965 (N.D. Cal. 2007), the court considered Feiner and other district court decisions and concluded that Feiner was inconsistent with the dicta in Gustafson.  The court held that § 12 is limited to shares purchased pursuant to a public offering and, therefore, does not extend to any aftermarket transactions.  Id. at 982-83. Similarly, in In re Wells Fargo Mortg. Backed Certificates Litig., the court held, "Unlike Section 11, which permits an action by a plaintiff who has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market."  712 F. Supp. 2d at 966; see also In re WorldCom, Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 11696, at *17 (S.D.N.Y.) ("The Feiner analysis is not persuasive."); In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 530 n.8 (S.D.N.Y. 2005) ("Only those plaintiffs who purchased Class O shares pursuant to (i.e., in) the IPO have standing to bring [a]

35

**United States District Court**
For the Northern District of California

section 12(a)(2) claim."). This Court concludes that this

reasoning better comports with <u>Gustafson</u> and <u>Hertzberg</u>.

Plaintiffs cite one decision, <u>Washington Mutual</u>, 694 F. Supp.

2d at 1225, to support their assertion that "courts within the

Ninth Circuit recognize that aftermarket purchases are

actionable." Opp. at 27 (internal quotation marks omitted).

However, that case does not so hold. Instead, in <u>Washington</u>

<u>Mutual</u>, the district court recognized that there was no clear

appellate authority on the issue and that there was a division

between district courts. 694 F. Supp. 2d at 1225. It noted that

some courts had held that standing "does not exist for those who

purchase securities in private and secondary markets outside of

the initial offering" and that other courts, such as that in

<u>Feiner</u>, had found that "liability is coextensive with the

prospectus's effective date." <u>Id.</u> (collecting cases). However,

the <u>Washington Mutual</u> court did not determine which approach was

correct and instead found that "[e]ven under" the "more expansive

reading of § 12(a)(2)" that would recognize aftermarket trading,

the plaintiffs in that case had failed to state a claim because

their purchases were made after the effective period of the

prospectus. <u>Id.</u> at 1225-26.

Accordingly, the Court finds that neither named Plaintiff has

standing to assert the § 12(a)(2) claim and thus it must be

dismissed. Plaintiffs are granted leave to amend, with a new

named Plaintiff who has standing to assert this claim.

3. Offerors or sellers of the securities

As previously noted, § 12(a)(2) imposes liability on any

person who "offers or sells" a security. The PacBio Defendants

also argue that Plaintiffs' § 12(a)(2) claim should be dismissed against PacBio and the Officer Defendants because they did not offer or sell the securities purchased by Plaintiffs.

In Pinter v. Dahl, 486 U.S. 622 (1988), the Supreme Court stated that § 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." Id. at 643 n.21. "Thus, a buyer cannot recover against his seller's seller." Id. In interpreting Pinter, the Fifth Circuit noted that, "in a firm commitment underwriting," such as that here, "the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers." Lone Star Ladies Inv. Club, 238 F.3d 363, 370 (2001). "Rather, the public purchases from the underwriters, and suing the issuers is an attempt to recover against the seller's seller." Id.

However, liability under §12 is not limited only to those who pass title to a purchaser. It also encompasses a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Pinter, 486 U.S. at 647. Thus, under the statute, a "'seller' is someone: (1) who passes title to the securities; or (2) who solicits the sale of securities to serve his own financial interest or the financial interest of the securities' owner." Fouad v. Isilon Sys., Inc., 2008 WL 5412397, at *7 (W.D. Wash.) (citing Pinter, 486 U.S. at 647-50).

Because the securities at issue were sold through a firm commitment underwriting, in which title passed to the Underwriter Defendants before passing to the ultimate purchasers, PacBio and

**United States District Court**
For the Northern District of California

the Officer Defendants were not immediate sellers.  See, e.g., Lone Star Ladies Inv. Club, 238 F.3d at 370.  Thus, the focus is whether Plaintiffs have alleged adequately active solicitation on the part of PacBio and the Officer Defendants.

Plaintiffs have argued that PacBio and the Officer Defendants engaged in solicitation by "signing a registration statement," "causing the inclusion of misleading statements in offering materials" and "controlling the defendant corporation."  Opp. at 29-30 (citing 1AC ¶¶ 15-24, 38, 66-68); see also 1AC ¶¶ 67-68 (alleging that these Defendants took actions that "included soliciting Plaintiff Powell and the Subclass by means of these defendants' participation in the preparation of the false and misleading Offering Materials").

The Ninth Circuit has not addressed whether allegations that a defendant signed a registration statement or prospectus, alone or combined with other possible solicitation activity, is sufficient to state a claim under § 12, and other courts that have addressed the issue have reached differing results.  See, e.g., In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534, 549 & n.3 (N.D. Cal. 2009) (collecting cases).  In Pinter, the Court recognized that § 12 did not encompass liability "for mere participation in unlawful sales transactions," even if the person was a "'substantial factor' in causing the sale."  486 U.S. at 650, 654.  "Courts have extrapolated" from the Supreme Court's statements in Pinter "a requirement that the defendant be alleged to have had some 'direct' role in the solicitation of the plaintiff, although the Ninth Circuit has not explained precisely what that direct role may entail."  In re Charles Schwab Corp.

**United States District Court**
For the Northern District of California

1  _Sec. Litig._, 257 F.R.D. at 549 (citing, among others, _In re Daou_

2  _Systems_, 411 F.3d at 1029; _In re Westinghouse Sec. Litig._, 90 F.3d

3  696, n.19 (3d Cir. 1996)).

4      Plaintiffs have adequately alleged more than mere

5  participation, including by alleging that these Defendants

6  participated in the preparation of, and signed, the purportedly

7  misleading solicitation documents.  The Court also agrees with

8  other courts that have held that "'whether an individual is a

9  seller under section 12 is a question of fact, not properly

10 decided on a motion to dismiss.'"  _In re Portal Software, Inc._

11 _Sec. Litig._, 2006 U.S. Dist. LEXIS 61589, at *11-12 (N.D. Cal.);

12 _see also_ _In re Charles Schwab Corp. Sec. Litig._, 257 F.R.D. at

13 550.

14 IV.  Claim against PacBio and the Officer Defendants for violation
       of § 10(b) of the Exchange Act and Rule 10b-5
15
       Section 10(b) of the Exchange Act makes it unlawful for any
16
   person to "use or employ, in connection with the purchase or sale
17
   of any security . . . any manipulative or deceptive device or
18
   contrivance in contravention of such rules and regulations as the
19
   [SEC] may prescribe."  15 U.S.C. § 78j(b); _see also_ 17 C.F.R.
20
   § 240.10b-5 (Rule 10b-5).  Rule 10b-5(b) clarifies that it is
21
   "unlawful for any person, directly or indirectly, . . . to make
22
   any untrue statement of material fact or to omit to state a
23
   material fact necessary in order to make the statements made, in
24
   the light of the circumstances under which they were made, not
25
   misleading . . . "  17 C.F.R. § 240.10b-5(b).  To state a claim
26
   under Rule 10b-5(b), a plaintiff must allege: "(1) a
27
   misrepresentation or omission of material fact, (2) scienter,
28

United States District Court
For the Northern District of California

(3) a connection with the purchase or sale of a security,
(4) transaction and loss causation, and (5) economic loss." In re
Gilead Sciences Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

Plaintiffs must plead any allegations of fraud with
particularity, pursuant to Rule 9(b) of the Federal Rules of Civil
Procedure. GlenFed, 42 F.3d at 1543. Pursuant to the
requirements of the PSLRA, the complaint must "specify each
statement alleged to have been misleading, the reason or reasons
why the statement is misleading, and, if an allegation regarding
the statement or omission is made on information and belief, the
complaint shall state with particularity all facts on which that
belief is formed." 15 U.S.C. § 78u-4(b)(1).

In support of this claim, Plaintiffs repeat the same
allegations that were made in support of the § 11 claim about the
offering materials. The Court finds that these allegations were
insufficiently plead for the same reasons as for the § 11 claim.

In addition, Plaintiffs base this claim on misrepresentations
or omissions in a number of post-IPO filings and oral statements,
many of which overlap with those purportedly made in the offering
materials. Defendants argue in their motion that none of these is
actionable and that Plaintiffs have not properly alleged scienter.
In their opposition, Plaintiffs address only three purported
misrepresentations and omissions other than those in the offering
materials and argue that they allege scienter properly for each of
these. These will be discussed individually below. Because
Plaintiffs have not defended the sufficiency of their allegations
related to any other misrepresentation or omission, they will not
be considered to support the § 10(b) claim.

Further, Plaintiffs have not defended the sufficiency of their allegations of scienter as to any Officer Defendant other than Martin.  "[T]he PSLRA and Rule 9(b) preclude attribution of knowledge or intent from one defendant to another."  <u>In re Sec. Capital Assur., Ltd. Sec. Litig.</u>, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010); <u>see also</u> <u>In re Accuray Sec. Litig.</u>, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (finding complaint insufficiently plead due to its failure "to plead facts identifying what each Defendant purportedly knew").  Accordingly, the Court GRANTS the motion to dismiss the § 10(b) claim against the Officer Defendants, other than Martin.

    A. Form 10-Q dated November 30, 2010, for the quarter ending September 30, 2010

In the 1AC, Plaintiffs point to one passage of the 2010 Third Quarter Form 10-Q that they allege is materially false and misleading.  This passage is similar to the statements in the offering materials about the LPR program and states in full:

> We instituted a limited production release program pursuant to which we received orders for eleven limited production release instruments from entities such as genome centers, clinical, government and academic institutions and agricultural companies.  This program was designed to help us garner quality feedback on the product prior to our full commercial launch scheduled for the first half 2011.  We received orders for our limited production release instrument from [eleven institutions].  <u>As of November 15, 2010, we had shipped a total of eleven PacBio RS limited production release instruments.</u>  Limited production release instruments are designed to provide early access to the technology, while we complete the research, development and testing required for full commercial release.  Therefore, performance during the limited production release phase will not be equal to that of the system at commercial release.  There will be a continuous evolution of these performance variables, including readlength and throughput, during the limited production release phase as we develop new versions of our software and consumables.  During a testing period, which we expect

> to last at least through the end of 2010, we will be
> working with these customers to obtain feedback and plan
> to incorporate relevant improvements into the commercial
> release version of the PacBio RS.  Generally, each
> customer is obligated to pay us a deposit after
> accepting a limited production release instrument, and
> is entitled to receive an upgrade to a commercial
> release version of the PacBio RS, at which time each
> customer will be obligated to pay the balance of their
> order and we will then recognize revenue.  While we
> expect to deliver upgrades to all of these customers, we
> cannot provide assurance that we will succeed and
> recognize revenue from our limited production release
> customers.

1AC ¶ 78 (emphasis added in 1AC).  Plaintiffs state in their 1AC

that the Form 10-Q "made no mention of the discrepancy in the

single molecule raw read accuracy figures."  Id. at ¶ 79.

Plaintiffs allege that the omission of this information "made the

statements in the Form 10-Q about the status of the limited

production release program, which was critical to the Company's

future success, materially false and misleading."  Id.

In their opposition brief, however, Plaintiffs do not explain

what this "discrepancy" was or how the omission of the raw read

accuracy rate rendered the above passage about the LPR program to

be misleading or false.  They make only conclusory statements that

they have plead this adequately.  Instead, in their brief, they

argue that the passage in the Form 10-Q was also misleading

because there were material omissions of a variety of other

information, including that the LPR program was a beta program,

that there were "bugs," that there was "variability" on

performance metrics and that there was a trade off between

accuracy and readlength.  However, they did not specify in the 1AC

that these were the reasons that the statements in the Form 10-Q

were misleading or explain how the Form 10-Q was rendered

**United States District Court**
For the Northern District of California

misleading by those omissions.[2]  Accordingly, they have not met
the pleading requirements of the PSLRA as to these purported
reasons.

Even if the omissions argued in the opposition had been
alleged in the 1AC, Plaintiffs have not adequately explained how
they would render the Form 10-Q misleading.  Among other things,
the passage properly discloses that the LPR program is a beta
program, as discussed above.  Further, it clearly discloses that
the performance of the RS system during the LPR program would not
equal to that of the commercial release version and that the
performance variables would evolve during this testing phase.

In addition, Plaintiffs have not plead sufficiently that
Martin made omissions with the requisite scienter.  "'To meet this
pleading requirement, the complaint must contain allegations of
specific contemporaneous statements or conditions that demonstrate
the intentional or the deliberately reckless false or misleading
nature of the statements when made.'"  Metzler Inv. GMBH v.
Corinthian Colleges, Inc., 540 F.3d 1049, 1066 (9th Cir. 2008)
(quoting Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001)).  A
"plaintiff must 'state with particularity facts giving rise to a
strong inference that the defendant acted with the required state
of mind.'"  Id. (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis in
original).  This is assessed by considering "the complaint in its
entirety" and determining "whether all of the facts alleged, taken
collectively, give rise to a strong inference of scienter."

----

     [2] Many of the paragraphs of the 1AC that Plaintiffs cite in
their opposition brief relate to the prospectus and not to the
Form 10-Q.

**United States District Court**
For the Northern District of California

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323
(2007) (emphasis in original).

Plaintiffs allege that Martin made comments on November 30,
2010 which reveal that he knew there were material omissions
regarding the status of the LPR program as a beta test and
regarding bugs, accuracy and a trade off between accuracy and
readlength.  Specifically, Plaintiffs cite Martin's statements
addressing the average readlength, consensus accuracy and raw read
accuracy of the "initial beta" and stating, among other things,
that "he was 'very pleased with the progress we've made from July
through now'" and that "some of the beta sites had received
'upgrades including 'new software features' and were experiencing
'nice progress with increased readlength and accuracy.'"  Opp. at
23 (quoting 1AC ¶¶ 86-88) (emphasis added in brief).  Plaintiffs
explain that, by using the word "progress," Martin implicitly
admitted "that the RS system was not consistently meetings its
specifications."  Id.

However, the comments made by Martin are consistent with the
portion of the Form 10-Q that Plaintiffs have identified as
misleading.  The passage made clear that there would be
"continuous evolution of these performance variables, including
readlength and throughput, during the limited production release
phase as we develop new versions of our software and consumables."
Martin's comments merely amount to a statement that the
"continuous evolution" that was disclosed was in fact taking place
and do not support a finding of scienter.

44

B. Martin's February 15, 2011 oral statement that "we can do pretty much any re-sequencing application with the raw read accuracy at around 85%"

Plaintiffs allege that, during a February 15, 2011 earnings call, Martin stated, "Our customers right now, today, we can do pretty much any re-sequencing application with the raw read accuracy at around 85% that we have." 1AC ¶ 102.  In their opposition brief, Plaintiffs argue that this statement was "materially false when made."  Opp. at 25.  They argue that the falsity of this statement is shown by analyst reports, released before and after February 15, 2011, that expressed concern over the low raw-read accuracy and because PacBio's Chief Technology Officer noted that the PacBio RS's accuracy was "81 to 84%."  Id. at 23-25.  The reports indicated that "some researchers were concerned that longer reads might result in higher error rates which could reduce the overall utility of the system." 1AC ¶ 107. Plaintiffs appear to argue that Martin's comment was false or misleading because the low raw read accuracy rate in fact reduced customers' ability to use the RS system for some applications. Plaintiffs also contend that Martin's later statement that "our initial raw read accuracy of 85% limited some of our users to certain applications" establishes that his earlier statement was false and that he had admitted its falsity.  Opp. at 25-26 (citing 1AC ¶ 122).

However, in their opposition brief, Plaintiffs remove Martin's February 15, 2011 comment from its context and ignore that this statement refers to "any re-sequencing application," not any application whatsoever.  Martin stated,

Our customers right now, today, we can do pretty much any re-sequencing application with the raw read accuracy

> at around 85% that we have.  And our customers are telling us they'd really like to see us for de novo sequencing, especially de novo mammalian, they'd like to see if it's 90% or greater.  And I am confident that with time we're absolutely going to be able to get there.

1AC ¶ 102.  Thus, Martin made clear that his claim was made regarding only one type of application of the RS device--re-sequencing applications--and not about other types of sequencing--de novo sequencing.  He also made clear that users were asking for improvements to the raw read accuracy in order to perform de novo sequencing.  This is consistent with the analysts' reports and Martin's other statements.

Accordingly, Plaintiffs have not sufficiently plead that Martin made materially false or misleading statements.  In addition, given that Martin disclosed that the raw read accuracy rate was "around" eighty-five percent and that customers were asking for a higher level for de novo sequencing, Plaintiffs have not alleged sufficient facts that would establish a strong inference that Martin acted intentionally or deliberately recklessly in making false or misleading statements.

C. Martin's February 15, 2011 oral statement regarding delivery time

Plaintiffs also argue that a second comment that Martin made during the February 15, 2011 earnings call was false or misleading.  They allege that, during the call, Martin was asked by an analyst,

> as you talk to your potential customers, what are some of the key factors holding them back, maybe, from placing an order at this point?  And you know, specifically in terms of your current throughput, is that an issue that comes up in your conversations for the type of customers that you are currently targeting?

United States District Court
For the Northern District of California

1AC ¶ 104. They allege that he responded, "No, it doesn't. I think they--the biggest issue that comes up at our conversation is when they can actually get the system. That by far and away, delivery time is the conversation." Id.

Plaintiffs contend that this statement was materially false because this was not "the biggest topic of conversation" and "[p]otential customers were not, and never had been clambering for PacBio's product because of . . . stability and variability issues" and "the limitations imposed by the 85% raw read accuracy." Opp. at 26. Plaintiffs contend that the statement was shown to be materially false when, on a later earnings call on August 4, 2011, after the commercial release of the RS system on April 27, 2011, Martin pointed to "two factors that have impacted our new order uptake," which he identified as the "stability and variability issues" that had existed in the beta systems and the "initial raw read accuracy of 85%," which had "limited some of our users to certain applications." Opp. at 26 (citing 1AC ¶ 122). Plaintiffs also cite paragraph ninety-five of their 1AC, which quotes a December 14, 2010 Nature article that discussed a competitor's product, which was priced to be affordable to individual labs, unlike the PacBio RS system, and which had a higher stated accuracy rate, although a lower readlength. 1AC ¶ 95.

The Court finds that Plaintiffs have not plead sufficiently that the February 15, 2011 statement was misleading or false or that it was made with the requisite scienter. The fact that other issues later became a prominent topic of discussion with customers does not mean that, at the time of Martin's February 15, 2011

United States District Court
For the Northern District of California

1  statement, delivery time was not the biggest topic of conversation

2  with potential customers.  Plaintiffs must allege that the

3  statement was false at the time it was made.  In addition, the two

4  comments were in different contexts.  The first one was made prior

5  to the commercial release, during a time period when the final

6  specifications of the commercial system were still developing.  It

7  is reasonable that one major focus of conversations with customers

8  would be about when the company expected to be able to deliver the

9  commercial systems.  The second was made after the commercial

10 release and addressed the factors that had impacted the rate at

11 which new orders were placed.  The Nature article similarly does

12 not demonstrate that the "current throughput" was an issue that

13 was coming up for customers that PacBio was targeting during the

14 LPR program or that "delivery time" was not the biggest issue that

15 was arising.

16     C. Summary

17     Accordingly, the Court GRANTS the PacBio Defendants' motion

18 to dismiss the § 10(b) claim against the Officer Defendants and

19 PacBio.  Plaintiffs are granted leave to amend this claim to

20 remedy the deficiencies identified above, provided that they are

21 able to do so truthfully and meet the pleading requirements of

22 Rule 8, Rule 9 and the PSLRA.

23 V.  Claims against the Officer Defendants and the Director
       Defendants for violation of § 15 of the Securities Act and
24     against the Officer Defendants for violation of § 20(a) the
       Exchange Act

25

       Both the Exchange Act and the Securities Act provide for
26
   joint and several liability for every person who, directly or

27

28

                                   48

indirectly, controls any person found liable under other provisions of the Acts.

Defendants contend that Plaintiffs have not plead sufficiently that each of the Officer and Director Defendants were controlling persons of PacBio.  Plaintiffs alleged, among other things, that these individuals signed the offering materials, were in "high-level positions" and had "direct and supervisory involvement in the day-to-day operations of the Company."  See, e.g., 1AC ¶¶ 15-24, 74, 166-67.  Other courts in this district have found similar allegations regarding control sufficient to survive a motion to dismiss.  See, e.g., Rafton v. Rydex Series Funds, 2011 U.S. Dist. LEXIS 707, at *32-33 (N.D. Cal.) (finding sufficient allegations that "Defendants are high level officers and signed registration statements"); In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. at 555 (holding, "Where a board member is alleged to have signed the registration statements at issue, however, courts have presumed that the director exercised actual authority and control, at least over the contents of and/or release of those statements.")  Accordingly, the Court finds these allegations sufficient at this stage to support that the Officer and Director Defendants were controlling persons.

However, under the relevant provisions, there must be an underlying primary violation of the Acts before so-called "control person" liability can be found.  See 15 U.S.C. §§ 77o (requiring a primary violation of § 11 or 12 of the Securities Act), 78t(a) (requiring a primary violation of the Exchange Act or any rule or regulation thereunder).  Because Plaintiffs have failed to plead adequately a primary violation under either Act, the Court grants

United States District Court
For the Northern District of California

the PacBio Defendants' motion to dismiss their claims under § 15
of the Securities Act and § 20(a) of the Exchange Act.  Plaintiffs
are granted leave to re-assert these claims, provided they are
able to plead the primary violations.

CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants'
motions to dismiss (Docket Nos. 56 and 61).

Plaintiffs are granted leave to amend their claims as stated
above, within sixty days of the date of this Order.  Defendants
shall respond to any amended pleading within four weeks
thereafter.  If Defendants file a motion to dismiss, Plaintiffs
shall file their response two weeks thereafter, Defendants may
file a reply one week thereafter and the Court will resolve the
motion on the papers.

If Defendants file an answer, within two weeks thereafter,
the parties shall file a stipulation to set a case management
conference, setting forth the dates on which they are available to
appear.

IT IS SO ORDERED.

Dated: 4/15/2013

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California